# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

Charlotte C. Ghiorse,

                                        Plaintiff,

            v.                                    3:25-CV-1578
                                                  (BKS/MJK)

John H. Cook, Jr. Painting Contractor, Inc., *et. al.*,

                                        Defendant.

_____

Charlotte C. Ghiorse, Plaintiff *pro se*

Mitchell J. Katz, U.S. Magistrate Judge

To the Honorable Brenda K. Sannes, Chief U.S. District Judge:

## ORDER & REPORT- RECOMMENDATION

On November 10, 2025, Ghiorse began this action by filing a Complaint and moving for leave to proceed *in forma pauperis* ("*IFP*") (Dkts. 1, 2). The Clerk sent Ghiorse's Complaint and *IFP* application to this Court for review. (Dkts. 1, 2).

## I.    BACKGROUND

On June 1, 2023, Charlotte Ghiorse began working for John H. Cook Jr. Painting Contractor, Inc. ("the painting company"). (Complaint, Dkt. 1, at pg. 1). "From the very first day of" her employment, employees subjected her "to non-stop sexually loaded conversation[s] and a hostile environment." (*Id.*). In response, Ghiorse

1

quipped "that this is my place of work stop talking like that." (*Id.*).

Jerry, the supervisor, "instigated and encouraged" "non-stop comments

regarding women and gender," specifically noting that "women don't

belong here." (*Id.*). When Ghiorse asked "them" to stop, the

conversations escalated. (*Id.* at pgs. 1-2). While Ghiorse tried to avoid

the people making comments, she was unsuccessful. (*Id.* at pg. 2).

Within one day of working at the painting company, Ghiorse's wages

were threatened. (*Id.*). But Dan Jackson explained to Ghiorse that "her

pay couldn't be decrease[d] because she was in the union and . . . there

is a set pay in [her] contract." (Exh. D, Dkt. 1-4, at pg. 1).

At one point, John H. Cook Jr., the co-owner of the painting

company, screamed at Ghiorse while she was at the top of a ladder. (*Id.*

at pg. 2).

Alex Stevens, one of Ghiorse's former coworkers, "saw several

instances of harassment directed at" Ghiorse. (Exh. B., Dkt. 1-2, at pg.

1). Stevens notes that the comments were "inappropriate and sexist."

(*Id.*) (cleaned up). Stevens also notes that Jerry "went along with the

deriding of [Ghiorse] and others" and he told Stevens that "women

shouldn't be on the job site." (*Id.*) (cleaned up). Similarly, Tevin McGill,

another one of Ghiorse's former co-workers, noted that "Jerry the manager and the other employees," would make "vulgar and demeaning" comments and he "heard sexual discrimination rants against [Ghiorse]." (Exh. C, Dkt. 1, at pg. 1). Specifically, McGill notes that Jerry said "Charlotte['s] just jealous because no one wants to fuck her pussy." (*Id.*). This environment caused Ghiorse to feel "terrorized," "concerned for [her] physical safety, and" concerned for her "mental health." (Complaint, Dkt. 1, at pg. 2).

Concerned, Ghiorse told Jerry that her last day would be June 14, 2023. (*Id.*). Ghiorse's resignation caused Jerry to go on a "screaming tirade about 'it's women like you' and that [Ghiorse] should know better." (*Id.*). Jerry then made "sexually verbally harassing" comments toward her. (*Id.*).

Ghiorse believes that she has "been discriminated based on [her] sex, female" (*Id.*). So she now brings this lawsuit against the painting company, Cook, and Jerry.[1]

---

[1] Ghiorse obtained an E.E.O.C. right to sue letter. See (Exh. E, Dkt. 1-5, at pg. 1).

## II.    *IFP* APPLICATION

Ghiorse declares in her *IFP* application that she is unable to pay the filing fee. (Dkt. 2). After reviewing her application, this Court finds that Ghiorse is financially eligible for *IFP* status.

## III.    STANDARD OF REVIEW

On their own, courts can dismiss a case—at any time—if they determine that an action is (1) frivolous or malicious; (2) fails to state a claim on which relief may be granted; or (3) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915 (e)(2)(B)(i)-(iii).

When determining whether an action is frivolous, courts must consider whether the complaint lacks an arguable basis in law or fact. *See Neitzke v. Williams*, 490 U.S. 319, 325 (1989); 28 U.S.C. § 1915. Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldredge*, 505 F.2d 802, 804 (8th Cir. 1974).

Courts must show liberality toward *pro se* litigants and use extreme caution when *sua sponte* dismissing *pro se* complaints. *See Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d

Cir. 2000). However, courts have a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See id.*

## IV.    DISCUSSION

**The District Court should allow Ghiorse's work-place-discrimination claims against the painting company to proceed but it should dismiss the remaining claims.**

The Court recommends dismissing the Complaint as to John Cook Jr. and Jerry but allowing the Complaint to proceed as to the painting company. In Section IV. A., the Court finds that Ghiorse plausibly alleges Title VII's objective and subjective elements against the painting company. Yet, Ghiorse cannot sustain a claim for individual liability against Jerry or Cook under Title VII. In Section IV. B., the Court finds that Ghiorse plausibly alleges a New York State Human Rights law claim against the painting company, but fails to state enough facts to sustain a claim for individual liability against Jerry or Cook.

### A. Ghiorse's Title VII claims.

"The hostile work environment standard includes both objective and subjective components." *McNamara v. Cnty. of Saratoga*, 748 F. Supp. 3d 68, 89 (N.D.N.Y. 2024) (cleaned up). To state a Title VII

hostile-work-environment claim, plaintiffs must plausibly allege "(1) that the alleged conduct was severe or pervasive enough to create an *objectively* hostile or abusive work environment and (2) that the plaintiff *subjectively* perceived that environment to be abusive." *Black v. Verizon Commc'ns, Inc.*, No. 20-CV-5309, 2025 WL 888477, at *8 (E.D.N.Y. Mar. 22, 2025) (cleaned up). When assessing the objective component, courts examine "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Id.* "The incidents typically must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *McNamara*, 748 F. Supp. 3d at 89 (cleaned up). That is not to say "a single incident may" not "qualify. But to do so, it must be 'extraordinarily severe.'" *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020) (cleaned up). Not to be forgotten, plaintiffs must also plausibly allege that the "complained of conduct" was created "because of the plaintiff's sex." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007).

Ghiorse subjectively perceived her environment as abusive. Ghiorse alleges that Jerry, "instigated and encouraged" continuous "comments regarding women and gender," specifically noting that "women don't belong here." (Complaint, Dkt.1, at pg. 1). When Ghiorse asked "them to stop" the comments "escalated." (*Id.* at pgs. 1-2) (cleaned up). Fed up, Ghiorse told Jerry that June 14, 2023, would be her last day. (*Id.* at pg. 2). In response, Jerry "went on a screaming tirade about 'it's women like you' and that [Ghiorse] should know better." (*Id.*). Jerry then made "sexually verbally harassing" comments toward Ghiorse. (*Id.*). All told, Ghiorse, who "was subjected to a sexually tainted environment and comments" about her "gender," believes that she has been "discriminated against based on her sex, female." (*Id.*; Exh. A, Dkt. 1-1, at pg. 1); *see also Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). Doubtless, the Complaint plausibly alleges the subjective element. *See Torres v. Pisano,* 116 F.3d 625, 631 (2d Cir.1997) (concluding that "general allegations of constant abuse" creates a jury question as to severity and pervasiveness "even in the absence of specific details about each incident").

Turning to the objective element, Ghiorse's Complaint plausibly alleges that the alleged conduct was severe or pervasive enough to create an objectively hostile or abusive work environment. In the 14 days that Ghiorse worked at the painting company, Alex Stevens, one of Ghiorse's former coworkers, "saw several instances of harassment directed at" Ghiorse. (Exh. B., Dkt. 1-2, at pg. 1). Stevens notes that the comments were "inappropriate and sexist." (*Id.*) (cleaned up). Stevens also notes that Jerry "went along with the deriding of [Ghiorse] and others" and he told Stevens that "women shouldn't be on the job site." (*Id.*) (cleaned up). Similarly, Tevin McGill, another one of Ghiorse's former co-workers, noted that "Jerry the manager and the other employees," would make "vulgar and demeaning" comments and he "heard sexual discrimination rants against Charlotte." (Exh. C, Dkt. 1, at pg. 1). Specifically, McGill notes that Jerry said "[Ghiorse's] just jealous because no one wants to fuck her pussy." (*Id.*). This environment caused Ghiorse to feel "terrorized," "concerned for [her] physical safety, and" concerned for her "mental health." (Complaint, Dkt. 1, at pg. 2). Considering §1915's forgiving review, Ghiorse's Complaint plausibly pleaded the objective element. *See Patane*, 508 F.3d at 114–15 (2d Cir.

2007) (finding that all three elements were sufficiently pleaded when the plaintiff pled "facts sufficient to allow a jury to find much of Clark's complained of conduct particularly offensive to women and intended to provoke Plaintiff's reaction as a woman.").

Ghiorse's Complaint plausibly alleges a Title VII work-place-discrimination claim against the painting company. "When the harassment is attributable to a co-worker, the employer will be held liable only for its own negligence." *Black*, 2025 WL 888477, at *9. "In such cases, the plaintiff must show either (1) that the employer failed to provide a reasonable avenue for complaint or (2) that the employer knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Id.* (internal quotation omitted). The Complaint makes clear that everyone was aware of how Ghiorse was being treated. *See, e.g.,* (Exh. C, Dkt. 1, at pg. 1) (noting that "Jerry the manager and the other employees," would make "vulgar and demeaning" comments). Yet the Complaint does not allege that any action was taken. *See generally* (Complaint, Dkt. 1). Thus, this Court finds that Ghiorse plausibly alleges a hostile-work-environment claim against the painting company. And because of

that finding, this Court recommends the District Court allow Ghiorse's Title VII hostile-work-environment claim against the painting company to proceed.

But the contours of the claim need clarification for liability purposes. Ghiorse needs to identify whether Jerry is a supervisor or an employee, as a matter of law. "To establish employer liability for hostile actions taken by an employee, a plaintiff must establish that the hostile work environment can be imputed to the employer." *E.E.O.C. v. Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d 497, 511 (E.D.N.Y. 2014) (cleaned up). "Where the harasser is a supervisor, an individual empowered to take tangible employment actions against the victim, and the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable." *Id.* (cleaned up). On the other hand, employers are liable under a negligence theory "only if [the employer] was negligent in controlling working conditions." *Vance v. Ball State University*, 570 U.S. 421, 424 (2013).

It is unclear if Jerry is a supervisor. "An employee is a supervisor only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a significant

10

change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 91 (2d Cir. 2019) (quoting *Vance*, 570 U.S. at 431 (2013)). Here, the Complaint does not identify what power Jerry had to take tangible employment actions against Ghiorse. *See generally* (Complaint, Dkt. 1). In fact, Ghiorse's own exhibits note that "her pay *couldn't* be decrease[d] because she was in the union and . . . there is a set pay in [her] contract." (Exh. D, Dkt. 1-4, at pg. 1) (emphasis added). Because the Complaint is unclear as to Jerry's powers, the Court views Jerry as a non-supervisor employee. And because the Court views Jerry as such, it construes the Complaint as only alleging a negligence theory of liability. If Ghiorse it trying to allege a strict liability theory, she must amend her Complaint to identify *how* Jerry is a supervisor. As the Complaint is now, it is unclear if Jerry is a supervisor as a matter of law.

To the extent Ghiorse is alleging a Title VII claim against Jerry and Cook individually, this Court recommends dismissing those claims *without prejudice* and *without leave to amend*. Title VII does not permit

11

individual liability. *See Antoine*, 489 F. Supp. 3d at 89. ("In contrast to Title VII, however, individuals may be held liable under the [New York State Human Rights Law] for employment discrimination."). Because Title VII does not permit individual liability, the Court also construes the Complaint as raising New York State Human Rights Law claims. *See id.*[2]

### B. Ghiorse's New York State Human Rights Law claims.[3]

New York hostile-work-environment claimants must establish that they were "subjected to inferior terms, conditions or privileges of employment because of the individual's membership in one or more protected categories." *Borden v. City of New York*, No. 23-CV-8330, 2025 WL 754147, at *7 (E.D.N.Y. Mar. 10, 2025). This standard is "more lenient" than Title VII's severe or pervasive standard. *Mondelo v.*

---

[2] Unlike Title VII, New York State Human Rights Law does not require an individual to bring a Complaint to the Human Rights Division before filing a lawsuit in federal court. See N.Y. Exec. Law § 297 (nothing that a person "aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction . . . unless such person ha[s] filed a complaint" with the human rights division "or with any local commission on human rights . . .").

[3] For the Court to address the New York State Human Rights Law claim it must exercise supplemental jurisdiction. See 28 U.S.C. §1367

*Quinn, Emanuel, Urquhart & Sullivan, LLP*, No. 21-CV-02512, 2022 WL 524551, at *9 (S.D.N.Y. 2022).

Ghiorse plausibly alleges a New York hostile-work-environment claim. The Court need not spill much ink here. As stated above, Ghiorse plausibly alleges that the discriminatory treatment was severe and pervasive. So it follows that Ghiorse's Complaint meets New York's less demanding standard. Put another way, the Complaint plausibly alleges that the inferior conditions Ghiorse suffered occurred because she is a woman. As a result, this Court recommends permitting this claim to proceed.

Examining Ghiorse's New York law hostile-work-environment claim against Jerry, the Court recommends dismissing the work-place-discrimination claim *without prejudice* and *with leave to amend*. New York law permits individual liability for hostile-work-environment claims under two theories: "(1) if the defendant has an ownership interest in the employer or [(2)] has the authority to hire and fire employees[.]" *Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d at 523 (cleaned up). There are no allegations that Jerry has an ownership interest in the painting company. *See generally* (Complaint, Dkt. 1). So

the question is whether Jerry had the authority to hire and fire employees. But as stated earlier, the Complaint is silent as to the power Jerry has. Thus, the District Court should dismiss Ghiorse's New York state individual-liability-work-place-discrimination claim against Jerry.

Examining Ghiorse's New York law hostile-work-environment claim against Cook, the Court also recommends dismissing the claims against him *without prejudice* and *with leave to amend*. Pleadings must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief …" Fed. R. Civ. P. 8(a)(2). "The purpose of" Rule 8 "is to give fair notice of the claim being asserted so" adverse parties have "the opportunity to file a responsive answer, prepare an adequate defense, and determine whether the doctrine of res judicata is applicable." *Flores v. Graphtex*, 189 F.R.D. 54, 55 (N.D.N.Y. 1999) (cleaned up). The rule also requires the pleading to include "a short and plain statement of the grounds for the court's jurisdiction" and "a demand for the relief sought[.]" Fed. R. Civ. P. 8(a)(1), (3). "Although no technical form is required, the Federal Rules make clear that each allegation contained in the pleading must be simple, concise, and direct." *Cole v. Smrtic*, No. 1:24-CV-847, 2024 WL 4870495, at *2

(N.D.N.Y. 2024) (cleaned up). Allegations "so vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009) (summary order). While the Complaint identifies Cook as having an ownership interest in the painting company—which would sustain a theory of individual liability—it does not allege Cook engaged in any discriminatory conduct. (Complaint, Dkt. 1 at pg. 2). In fact, Ghiorse only notes that Cook screamed at her while she was on a ladder. (*Id.*). Those sorts of "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" are insufficient to state a claim. *Ashcroft*, 556 U.S. at 678. Thus, the Court recommends dismissing the claims against John Cook Jr. *without prejudice* and *with leave to amend*.

## C. The District Court should allow Ghiorse to amend her Complaint.

Generally, before courts dismiss a pro se complaint or any part of the complaint on its own, they should afford the plaintiff the opportunity to amend at least once; but leave to re-plead may be denied where any amendment would be futile. *See Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with a plaintiff's causes of action is substantive such that

better pleading will not cure it. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted). Here, Ghiorse can amend her Complaint and include facts about Jerry's role as a supervisor and any discriminatory conduct Cook engaged in. This would allow her to maintain a strict liability theory under Title VII, and individual liability against both Jerry and Cook under New York law. So amending the Complaint would not be futile.

## V. CONCLUSION

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the District Court **ALLOW** Ghiorse's Title VII hostile-work-environment claim against John H. Cook, Jr. Painting Contractor, Inc., to **PROCEED**; and it is further

**RECOMMENDED,** that the District Court **DISMISS** Ghiorse's Title VII hostile-work-environment claim against John M. Cook, Jr. **WITHOUT PREJUDICE** and **WITHOUT LEAVE TO AMEND**; and it is further

**RECOMMENDED,** that the District Court **DISMISS** Ghiorse's Title VII hostile-work-environment claim against Jerry **WITHOUT PREJUDICE** and **WITHOUT LEAVE TO AMEND**; and it is further

**RECOMMENDED,** that the District Court **ALLOW** Ghiorse's New York State Human Rights law hostile-work-environment claim against John H. Cook, Jr. Painting Contractor, Inc., to **PROCEED**; and it is further

**RECOMMENDED,** that the District Court **DISMISS** Ghiorse's New York State Human Rights law hostile-work-environment claim against John M. Cook, Jr. **WITHOUT PREJUDICE** and **WITH LEAVE TO AMEND**; and it is further

**RECOMMENDED,** that the District Court **DISMISS** Ghiorse's New York State Human Rights law hostile-work-environment claim against Jerry **WITHOUT PREJUDICE** and **WITH LEAVE TO AMEND**; and it is further

**ORDERED**, that Plaintiff's motion to proceed *IFP* (Dkt. 2) is **GRANTED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (*per curiam*).

In accordance with 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written

objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *See Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: December 2, 2025.

_____
Hon. Mitchell J. Katz
U.S. Magistrate Judge

2025 WL 888477

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

Angela BLACK, Plaintiff,

v.

VERIZON COMMUNICATIONS, INC., Defendant.

2:20-cv-5309 (NJC) (LGD)

|

Signed March 4, 2025

|

Filed March 22, 2025

**Attorneys and Law Firms**

John C. Luke, Jr., Slater Slater Schulman LLP, Melville, NY, for Plaintiff.

Kimberly Natalie Dobson, Littler Mendelson P.C., Melville, NY, for Defendant.

**OPINION AND ORDER**

NUSRAT J. CHOUDHURY, United States District Judge:

 **\*1**  Plaintiff Angela Black ("Black") brings this action against her employer Verizon Communications, Inc. ("Verizon"), alleging that Verizon exposed her to a hostile work environment based on her sex, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296. (Compl., ECF No. 1.) Black seeks compensatory and punitive damages, as well as attorney's fees and costs. (Compl. at 7.)

Verizon has moved for summary judgment, arguing that no reasonable jury could find the following:

(1) that Black experienced harassment that was sufficiently "severe or pervasive" to state a claim under Title VII or the NYSHRL; [1]

(2) that the alleged harassment was based on Black's sex;

(3) that Black faced a material change to the terms and conditions of her employment as a result of the alleged harassment; or

(4) that Verizon failed to take sufficient action to stop the alleged harassment, as required to hold an employer liable under Title VII and the NYSHRL for the conduct of its employees in non-supervisory roles.

(Mem. Supp. Summ. J. ("Mem."), ECF No. 65-1.)

For the reasons set forth below, I find that genuine disputes of material fact exist as to these issues. Accordingly, I deny Verizon's motion for summary judgment.

**JURISDICTION**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Brown brings a claim under a federal statute, 42 U.S.C. § 2000e-2. The Court has supplemental jurisdiction over the state law claim alleged in the Complaint under 28 U.S.C. § 1367(a) because that claim is part of the same case or controversy as the federal claim.

Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391(b)(2) because the Complaint alleges that a substantial part of the events that gave rise to Black's claims occurred in this district. (Compl. ¶ 11.)

## BACKGROUND

The following facts are not in dispute, unless otherwise noted.

### I. The Parties

Verizon is a broadband communications company that provides telecommunications services. (Dobson Decl. Ex. 13, Perrella Decl. ¶ 3, ECF No. 65-14.) Black is a female employee who has worked at Verizon since June 12, 2000. (*See* Compl. ¶¶ 8, 10; Luke Decl. Ex. 1, Black July 11, 2022 Dep. Tr. ("Pl. Tr.") 94:19–21, ECF No. 66-3.) Since around 2017, Black has worked as a Representative based out of the Verizon service center located in Garden City, New York. (*See* Perrella Decl. ¶ 13; Pl. Tr. 98:16–99:2.) The service center is large and contains several departments and floors. (Pl. Tr. 118:21–119:5.) In her role as Representative, Black provides companies "with options for communications, such as [ ] internet access ... and determine[s] which of Verizon's business services would best suit their needs." (Pl. Tr. 98:16–99:2.)

### II. Verizon's Anti-Harassment Policies and Protocols

**\*2**  Verizon is an equal opportunity employer whose Equal Opportunity Employment and Affirmative Action Policy, which was in force during the events at issue in this litigation, states: "Verizon's policy is to provide equal employment opportunity ('EEO') to all persons without regard to ... gender ...." (Dobson Decl. Ex. 1, EOE Policy, ECF No. 65-4.) The version of Verizon's Code of Conduct that was operative in 2017 expressly states: "Verizon has a policy of zero tolerance for discrimination, sexual harassment or other harassment based on ... gender ...." (Dobson Decl. Ex. 2, 2017 Code of Conduct at D000375, ECF No. 65-5.) In 2019, Verizon issued an amended Code of Conduct, which provides in relevant part: "We are committed to maintaining a workplace free from illegal discrimination or harassment, including sexual harassment or harassment based on any other legally protected category. We respect and comply with all laws providing equal opportunity to individuals without regard to ... gender ...." (Dobson Decl. Ex. 3, 2019 Code of Conduct at D000413, ECF No. 65-6.) The 2019 Code of Conduct sets forth avenues for reporting sexual harassment, including "Human Resources, the Ethics Office, or the Legal Department." (*Id.* at D000414.) In particular, the Ethics Office is available 24/7 and permits anonymous reporting of workplace misconduct. (2019 Code of Conduct at D000410.) The 2019 Code of Conduct also provides contact information for the "Verizon Compliance Guideline," which employees can call or email for guidance on workplace conduct issues. (*Id.* at D000435.)

Verizon provides the operative Code of Conduct to employees on their first day and makes it available for viewing on the company's intranet. (Perrella Decl. ¶¶ 6, 9.) Verizon also trains its employees on anti-discrimination and anti-harassment annually. (Perrella Decl. ¶ 10.) Black received the 2019 Code of Conduct, was trained on the 2019 Code of Conduct's anti-harassment policies, and was aware of the various reporting mechanisms available to her under the 2019 Code of Conduct. (Pl. Tr. 244:13–15, 245:6–247:13.)

Black's employment is also subject to the terms of a collective bargaining agreement between Verizon and the Communication Workers' Union of America, AFL-CIO, Local 1105 (the "Union"), of which Black is a member. (Pl. Tr. 159:6–12, 160:25–161:4; Perrella Decl. ¶ 12.) The collective bargaining agreement provides that "neither the Company nor the Union shall unlawfully discriminate against any employee because of such employee's ... sex ..." (Dobson Decl. Ex. 4, Collective Bargaining Agreement art. 20, ECF No. 65-7.)

### III. The Alleged Harassing Conduct

Black alleges that she was harassed by Richard Reiner ("Reiner"). Reiner has been employed by Verizon since around May 1980 and, during the relevant time period, was working as a Special Representative in the Garden City service center. (Dobson Decl. Ex. 16, Reiner Sept. 19, 2022 Dep. Tr. ("Reiner Tr.") 8:20–25, ECF No. 65-17; Dobson Decl. Ex. 12, Reiner Decl. ¶¶ 2–3, ECF No. 65-13.) Like Black, Reiner received a copy of the 2019 Code of Conduct and attended annual trainings on anti-discrimination and harassment. (Reiner Decl. ¶¶ 5–6; Reiner Tr. 9:11–14.) Reiner never supervised Black, nor did the two even work on the same team. (Reiner Decl. ¶ 4; Pl. Tr. 131:20–132:6.) As such, there was no business reason for Black and Reiner to interact. (*See* Pl. Tr. 131:10–13.)

Around May 25, 2019, ABC aired a documentary titled "A Night in Central Park," covering the well-known "Central Park Jogger case" from the late 1980s, where five teenagers (the "Central Park Five") were wrongfully convicted and later exonerated for the attack and sexual assault of a woman in Central Park. (Reiner Decl. ¶ 7; Pl. Tr. 116:18–25.) The documentary featured old interview footage of Black, who is the sister of one of the exonerated teenagers. (Def.'s Ltr. Mot. Pre-Mot. Conf. Summ. J. Ex. 7, Investigation Report at D001371, ECF No. 53-9; Pl. Tr. 46:2–8.)

Many of Black's colleagues watched the documentary and recognized her, including Reiner. (Reiner Decl. ¶ 7.) The next day, on May 26, 2019, while Black was on the phone with a customer, Reiner said to her, "I saw a beautiful woman on TV last night, was that you?" (Pl. Tr. 117:22–118:2, 130:21–23.) Black did not respond to this question and, after this interaction, did not speak to Reiner for the rest of that day. (Pl. Tr. 130:24–131:9.) Black did not contemporaneously report this interaction to Verizon or the Union. (Pl. Tr. 133:2–6, 160:11–21.)

According to Black, after the May 26, 2019 interaction, Reiner began "leering" at Black, which she also described as "glaring" and "staring aggressively." (Pl. Tr. 169:9–13; 213:15–16.) From the period of May 26, 2019 to July 11, 2019, Reiner leered at her "[e]very day he was in the office." (Pl. Tr. 168:19.) Though Black was not able to quantify the exact frequency of Reiner's stares, she estimated that they started out at "once, maybe twice" per day. (Pl. Tr. 216:7–8.) Reiner disputes these accusations. (Investigation Report at D001380.)

**\*3** In addition, the two had an interaction in which Reiner asked Black about her family in a way that made her feel uncomfortable, although, again, Black's and Reiner's accounts differ on exactly what happened. (Pl. Tr. 154:18–23, 158:17–25; Reiner Decl. ¶¶ 8–9.) According to Black, Reiner told to her that because she and her brother had different fathers, he was not her "actual brother." (Pl. Tr. 155:18–22.) Based on Reiner's disclosure of the fact that he knew Black and her brother had different fathers, Black believed that Reiner had been researching her and her family and that, after seeing her in the documentary, he had become "sexually ... attracted" to her, "but in a hostile way." (Pl. Tr. 157:2–158:3.) According to Reiner, he merely asked Black "why her brother had a different last name than she did." (Reiner Decl. ¶ 8.) This conversation took place at some point between May 26, 2019 and July 11, 2019, although the exact date is not clear from the record. (*See* Reiner Decl. ¶ 8 (attesting that the conversation happened on or about May 26, 2019); Pl. Tr. 158:17–21 (testifying that the conversation happened sometime after May 26, 2019 but before July 11, 2019).)

On July 11, 2019, [2] Reiner asked Black about a tattoo she has on her breast, although, again, the accounts differ between Black and Reiner, as well as Mattee Pruitt, a Workforce Administrator at the Garden City service center who witnessed the incident. Their respective accounts are as follows:

• **Black's Account:** According to Black, she has a tattoo on her breast that "you cannot see" and which she has "never made visible in [the] office." (Pl. Tr. 172:14–19; *see also* Pl. Aff. ¶ 11, ECF No. 66-4 (Black attesting, "I have a tattoo on my left breast that is not visible unless you are looking down my shirt").) Black testified that Reiner had "look[ed] down ... into [her] dress" on multiple occasions. (Pl. Tr. 172:19–173:3.) On that day, he had looked "so intensely" that he could see her tattoo. (*Id.* at 172:22–173:3.) He subsequently asked, "What is on your boob?" (*Id.*) Pruitt, who was "in a conversation" with Black, asked Black, "What did he just say to you?" (*Id.* at 173:6–10.) Black responded, "I just hope he doesn't say

it again." (*Id.* at 173:14–15.) Reiner then said, "I want to know what the tattoo says on your boobs." (*Id.* at 173:16–19.) Black then told Reiner to get away from her, at which point he left. (*Id.* at 175:22–176:3.)

• **Reiner's Account:** According to Reiner, he was walking to the printer and noticed Black's tattoo, which was visible because she was wearing a low-cut dress. (Reiner Tr. 13:15–21.) He asked, "What is that?" and Black "quickly lifted her dress." (*Id.* at 13:21–22.) Because he did not want her to think that he was referring to her breasts, he said, "Not the boobs, the tattoo." (*Id.* at 13:22–25.) Reiner maintains that he did not say the word "boob" more than once. (Reiner Decl. ¶ 8.)

• **Pruitt's Account:** According to Pruitt, Pruitt was on the phone at the time and did not hear exactly what Reiner said except the word "boob." (Dobson Decl. Ex. 15, Pruitt Sept. 29, 2022 Dep. Tr. ("Pruitt Tr.") 15:12–25; 16:18–22, ECF No. 65-16.) After getting off the phone, Pruitt asked Reiner, "What did you say?" Black then said to Reiner, "Do not answer." (*Id.* at 17:2–12.) After Reiner left, Black explained to Pruitt that he had said, "What is on your boob?" (*Id.* at 17:13–17.)

With Pruitt's permission, Black left work early that day. (Pruitt Tr. 28:25–29:11; Pl. Tr. 178:3–19.)

Shortly thereafter, Black spoke to Susan Nichols ("Nichols"), the Union Representative, and "explained to her everything leading up to that point." (Pl. Tr. 186:4–20.) The parties agree that Black told Nichols that she did not want Reiner to be fired, although Black further contends that she told Nichols that she wanted Reiner to be "transferred." (Rule 56.1 Resps. Objs. ¶ 54, ECF No. 66-1; Pl. Tr. 184:5–19.) On July 12, 2019, Nichols came to the service center and spoke to Reiner, instructing him to "stay away from," "not comment to," and "not talk to" Black. (Pl. Tr. 186:13–187:12, 193:14–22; Reiner Tr. 15:6–15.)

**\*4** The parties dispute whether Reiner complied with Nichols' instruction. (Rule 56.1 Statement Resps. Objs. ¶ 57.) Verizon, citing Reiner's deposition testimony, asserts that Reiner fully complied. (*Id.* (citing Reiner Tr. 15:13–17).) Black, citing her deposition testimony, asserts that Reiner began disobeying the direction the very next day and that, although she reported Reiner's continued leering to Joann Lee ("Lee"), one of the team leaders in Black's unit, Reiner's leering did not stop. (*Id.* (citing Pl. Tr. 194:16–209:11, 219:9–225:22).) She testified that, after her conversation with Nichols, Reiner's staring increased to three or four times a day, and that he would deliberately walk by Black's desk. (Pl. Tr. 216:5–17.) According to Black, many of her coworkers recognized that he was staring at her. (*Id.* at 216:9–17.)

Around the same time, Pruitt also reported the incident to her supervisor, Jason Murray ("Murray"), and submitted an official request for investigation through "Verizon's Compliance hotline." (Pruitt Tr. 19:13–25; Dobson Decl. Ex. 8, July 11, 2019 Case Detail Hotline Report at D001383–84, ECF No. 65-10.) Shortly thereafter, Black spoke to an employee from "either [the] ethics or EEO or HR" department, whose name she cannot recall. (Pl. Tr. 197:3–4.) During that conversation, Black informed the employee about Reiner's initial comment on May 26, 2019, his subsequent comments about her relationship to her brother, the July 11, 2019 incident, and his "glaring stares." (Pl. Tr. 174:4–8; 197:9–19.) Black separately spoke to Administrative Manager Deborah Jacobsen ("Jacobsen"), requesting to move desks due to Reiner's staring. (*Id.* at 198:19–20, 200:24–201:6.) Black does not remember exactly when she spoke to Jacobsen, but Jacobsen immediately granted Black's request and Black moved desks that same day. (198:21–23; 201:4–6.) Black testified, however, that the desk change did not stop Reiner from continuing to "stalk" her. (Pl. Tr. 203:11–210:14, 219:9–225:22.) [3]

According to Black, until sometime in October 2019, Reiner stared at her every day that both she and Reiner were in the office. (Pl. Tr. 168:17-20.) As to the pervasiveness of Reiner's behavior, Black testified:

> I mean, for me, this is months of me complaining, moving my desk, contacting the union, contacting HR, doing everything I could to stop him, I just want to work, just want to do my job, just want to try to continue to live, and what I was feeling at that time with my family, I was happy, and he took all of that away from me.

(Pl. Tr. 224:14–22.)

On October 2, 2019, Black reported to one of her team leaders that Reiner was walking up and down the aisle where she sat. (Pl. Tr. 203:11–21.) Later that day, Murray, Jacobsen and Union representative Tony Borelli ("Borelli") met with Reiner and told him that his "presence" in the unit in which Black worked was "causing feelings of discomfort for an employee." (Dobson Decl. Ex. 9, Oct. 2, 2019 Meeting Report I, ECF No. 65-11; *see also* Reiner Decl. ¶ 16.) At the meeting, they instructed Reiner to "stay out of that area of the office" while the matter was being investigated and that failure to comply "would be considered insubordination and disciplinary action could occur, up to and including dismissal." (Oct. 2, 2019 Meeting Report I; *see also* Reiner Decl. ¶ 16). The parties dispute whether Reiner complied with this instruction. (Reiner Decl. ¶ 17; Pl. Tr. 219:9–225:22.)

Another incident occurred on October 9, 2025, over which the parties dispute what exactly happened. According to Black, during a 15-minute break, she went to the section of the service center where Reiner's desk was located to visit her "close and dear friend" Erika Becker ("Becker"). (Pl. Tr. 219:23–220:3.) Reiner was not at his desk at the time, and Black testified that she would not have gone to that section had Reiner been at his desk. (*Id.* at 220:3–11.) While Black and Becker were talking, Reiner returned and began staring at Black. (*Id.* at 220:15–20.) At this point, Becker lifted her standing desk and Brown "went down to [her] knees" to hide from Reiner. (*Id.* at 220:20–221:3.) According to Reiner, Black "stood in front of [him] for several minutes while visiting [Becker]" and was "staring" at him. (Reiner Decl. ¶ 17.) Reiner "felt that [Black] was trying to bait [him] to respond." (*Id.*)

**\*5** After the October 9, 2025 incident, Reiner emailed Murray the following:

> OK, the woman who claims she is so uncomfortable around me has been standing in front of me now for several minutes, visiting her friend. She is looking at me, perhaps to bait me into saying something. Needless to say, this is making me most uncomfortable. I expect that shortly, she will be taken into a conference room where you will impose the same restrictions that have been imposed upon me. Clearly, her discomfort is a matter [of] convenience.

(Rule 56.1 Statement Resps. Objs. ¶ 68; Investigation Report at D001371.) [4] On October 10, 2019, Murray and Lee spoke to Black and, without identifying Reiner by name, informed her of Reiner's complaint. (Dobson Decl. Ex. 10, Documentation of Black Warning, ECF No. 65-12.) Specifically, Black was told the following:

> It has come to my attention that your presence in Rich Ramosk's unit is causing feelings of discomfort for an employee. For the time being, while this matter is being investigated, I am now giving you a directive to stay out of that area of the office. If you need to communicate with an associate, you should be using Jabber or asking a manager for assistance, you should not be walking up to their desk even if its to speak to a friend. We would ask that you do that in a breakroom or lounge rather than their desk. If you fail to follow this directive, that would be considered insubordination and disciplinary action could occur, up to and including dismissal.

(*Id.*) Black subsequently informed supervisors at Verizon that she was planning to hire a lawyer. (Investigation Report at D001372; Pl. Tr. 224:22–225:4.)

Black took a leave of absence beginning on October 10, 2019. (Pl. Aff. ¶ 33.) After the start of the COVID pandemic in March 2020, Black transitioned to working remotely. (Perrella Decl. ¶ 20.) As of the filing of the instant Motion, Black had not worked

in-person at the Garden City service center since October 2019. (Pl. Tr. 240:9–11, 241:19–243:3.) Likewise, Black has not interacted with Reiner in any way since October 2019. (Pl. Tr. 243:24–244:9.)

Human Resources Manager Michele Perrella ("Perrella") was tasked with investigating Black's allegations. (Perella Decl. ¶ 14–15.) During the 2019 investigation, Perrella conducted interviews of numerous employees, including Black, Reiner, and Pruitt. (Perrella Decl. ¶ 17.) One interviewee, [Redacted] told Perrella [Redacted] (Investigation Report at D001377.) In his interview, Reiner denied intentionally "glar[ing]" at Black. (Investigation Report at D001380.) Perrella concluded that Reiner had engaged in inappropriate and unprofessional workplace behavior and, accordingly, issued a document advising Reiner of Verizon's anti-harassment policies and warning him that "any further violations of policy or the Code of Conduct may lead to further disciplinary action." (Perrella Decl. ¶ 18; Dobson Decl. Ex. 11, Perrella Investigation Ltr., ECF No. 53-13.) Verizon also required employees at the Garden City service center to undergo additional training to remind them of the company's policies. (Pl. Tr. 246:2–6.)

## PROCEDURAL HISTORY

**\*6** On November 3, 2020, Black filed the Complaint in this action. (Compl.) Verizon filed its Answer on March 5, 2021. (ECF No. 10.) The case was originally assigned to District Judge Gary R. Brown. (Elec. Order, Nov. 4, 2020.) On October 10, 2023, the case was reassigned to my docket. (Elec. Order, Oct. 10, 2023.)

On October 20, 2023, Verizon timely filed a letter motion seeking a pre-motion conference in anticipation of its Motion for Summary Judgment. (ECF No. 51.) Black timely filed an opposition letter on November 9, 2023. (ECF No. 54; Elec. Order, Oct. 27, 2023.) On January 5, 2024, I held a pre-motion conference with the parties. (*See* Min. Entry for Jan. 5, 2024 Hr'g, Jan. 7, 2024.) At the conference, I stated my initial view that there was, at a minimum, a disputed question of material fact as to whether the alleged harassment was sufficiently severe or pervasive to constitute a hostile work environment—specifically, whether the alleged harassment continued after Verizon supervisors directed Reiner not to engage with Black. (*Id.*) I directed Verizon to file a letter informing the Court whether it intended to proceed with filing its Motion for Summary Judgment, and Verizon filed a letter on January 11, 2024 indicating that it would pursue such a motion. (*Id.*; ECF No. 60.) On January 12, 2024, I issued a briefing schedule, and on January 29, 2024, I granted Verizon's request for an extension of that schedule. (Elec. Order, Jan. 12, 2024; ECF No. 61; Elec. Order, Jan. 29, 2024.) Pursuant to the briefing schedule and the Court's recommended bundling practices, the parties filed their motion papers and supporting materials on the docket on April 5, 2024. (Mot. Summ. J. ("Mot."), ECF No. 65; Mem. Supp. Summ. J. ("Mem."), ECF No. 65-2; Opp'n Mot. Summ. J. ("Opp'n"), ECF No. 66; Reply Supp. Summ. J. ("Reply"), ECF No. 67.)

Along with its motion, Verizon filed a Memorandum in Support (Mem.), its Rule 56.1 Statement (Rule 56.1 Statement, ECF No. 65-1), and a declaration by its counsel Kimberly N. Dobson (Dobson Decl., ECF No. 65-3), attaching the following exhibits:

(1) Verizon's Equal Opportunity Employer Policy (Dobson Decl. Ex. 1, EOE Policy, ECF No. 65-4);

(2) Verizon's 2017 Code of Conduct (Dobson Decl. Ex. 2, 2017 Code of Conduct, ECF 65-5);

(3) Verizon's 2019 Code of Conduct (Dobson Decl. Ex. 3, 2019 Code of Conduct, ECF No. 65-6);

(4) An excerpt of the Collective Bargaining Agreement between Verizon and the Union (Dobson Decl. Ex. 4, Collective Bargaining Agreement, ECF No. 65-7);

(5) The job description for Black's role (Dobson Decl. Ex. 5, Black's Job Description, ECF No. 65-8);

(6) A summary of Verizon's anti-harassment training completed by Black (Dobson Decl. Ex. 6, Training Summary, ECF No. 65-9);

(7) Perrella's report summarizing her investigation results (Ltr. Mot. Summ. J. Ex. 7, Investigation Report, ECF No. 53-9); [5]

(8) A summary of Pruitt's July 11, 2019 report to Verizon's Compliance hotline (Dobson Decl. Ex. 8, Pruitt Report, ECF No. 65-10);

(9) A report summarizing Verizon supervisors' October 2, 2019 meeting with Reiner (Dobson Decl. Ex. 9, Oct. 2, 2019 Meeting Report I, ECF No. 65-11);

(10) An October 11, 2019 email memorializing the warning given to Black (Dobson Decl. Ex. 10, ECF No. 65-12);

(11) Additional documentation summarizing Verizon supervisors' October 2, 2019 meeting with Reiner (Ltr. Mot. Summ. J. Ex. 11, Oct. 2, 2019 Meeting Report II, ECF No. 53-13); [6]

**\*7** (12) Reiner's sworn declaration (Dobson Decl. Ex. 12, Reiner Decl., ECF No. 65-13);

(13) Perrella's sworn declaration (Dobson Decl. Ex. 13, Perrella Dec., ECF No. 65-14);

(14) Excerpts of the transcript of Black's deposition testimony (Dobson Decl. Ex. 14, Pl. Tr. Excerpts, ECF No. 65-15);

(15) Excerpts of the transcript of Pruitt's deposition testimony (Dobson Decl. Ex. 15, Pruitt Tr., ECF No. 65-16); and

(16) Excerpts of the transcript of Reiner's deposition testimony (Dobson Decl. Ex. 16, Reiner Tr., ECF No. 65-15).

Black filed a memorandum in opposition ("Opposition") (Opp'n), her Responses and Objections to Verizon's Rule 56.1 Statement (Rule 56.1 Statement Resps. Objs., ECF No. 66-1), and a declaration by her counsel, John Luke (Luke Decl., ECF No. 66-2), attaching the following exhibits: (1) the full transcript of Black's deposition (Pl. Tr., ECF No. 66-3) and (2) an affidavit by Black (Pl. Aff., ECF No. 66-4). Verizon filed a reply brief ("Reply") (Reply, ECF No. 67).

The Motion is now fully briefed.

## LEGAL STANDARDS

### I. Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a material question of fact. *Balderramo v. Go N.Y. Tours Inc.*, 668 F. Supp. 3d 207, 219 (S.D.N.Y. 2023) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). [7] "A fact is material if it might affect the outcome of the suit under the governing law." *Cunningham v. Cornell Univ.*, 86 F.4th 961, 980 (2d Cir. 2023) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A dispute of "material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In order to defeat summary judgment, the non-moving party must set forth sufficient facts showing that there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c). The non-moving party "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Daly v. Westchester Cnty. Bd. of Legislators*, No. 23-1220-CV, 2024 WL 3264125, at \*2 (2d Cir. July 2, 2024). "Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Banes*, 593 F.3d 159, 166 (2d Cir. 2010). A court considering whether summary judgment is appropriate "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Cunningham*, 86 F.4th at 980; *see also Woods v. Centro of Oneida, Inc.*, 103 F.4th 933, 939 (2d Cir. 2024) ("We may find for the movant defendant only if

we conclude that on the record presented, considered in the light most favorable to the non-movant plaintiff, no reasonable jury could find in the plaintiff's favor."). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983).

## II. Hostile Work Environment

**\*8** A hostile work environment claim under Title VII requires a plaintiff to show that her workplace was "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [ ] her employment were thereby altered." *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 101 (2d Cir. 2020); *see also Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (holding that Title VII is not "a general civility code" but rather "forbids only behavior so objectively offensive as to alter the conditions of the victim's employment"). This inquiry "involves both objective and subjective elements." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009). To prevail on a hostile work environment claim, the plaintiff must show (1) that the alleged conduct was "severe or pervasive enough to create an *objectively* hostile or abusive work environment" and (2) that the plaintiff "*subjectively* perceive[d] that environment to be abusive." *Id.* (emphasis added). In the objective inquiry, courts assess the totality of circumstances, weighing various factors, including: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). The plaintiff must prove that she faced "harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse"; in this inquiry, however, the Second Circuit has cautioned against "setting the bar too high." *Id.*

The plaintiff must also prove that her membership in a protected class caused her to experience a hostile work environment. *Id.* at 112; *see also* 42 U.S.C. § 2000e-2(a) (prohibiting adverse employment actions "*because of* such [employee's] race, color, religion, sex, or national origin" (emphasis added)). In other words, courts apply a "but-for" causation test to determine whether the plaintiff would have experienced the same hostile work environment had she not been a member of the protected class at issue (here, Black's protected class is sex). *Bostock v. Clayton County*, 590 U.S. 644, 656, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020).

On October 11, 2019, the New York legislature amended N.Y. Exec. Law § 296 to remove the "severe or pervasive" requirement for discrimination claims brought under the NYSHRL. *See* N.Y. Exec. Law § 296(1)(h) (creating a cause of action for harassment claims "regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims"); *Maiurano v. Cantor Fitzgerald Securities*, No. 19-cv-10042, 2021 WL 76410, at *3 n.2 (S.D.N.Y. Jan. 8, 2021). The amendment, however, only applies to NYSHRL claims that accrued before the amendment became effective on October 11, 2019. *Maiurano*, 2021 WL 76410, at *3 n.2; N.Y. Senate Bill S6594/A8424 ("Section[ ] one ... shall only apply to claims accrued under such sections on or after the effective date of such section[ ].").

Verizon argues that the last alleged act of harassment occurred on October 1, 2019, when Reiner allegedly reported Black's presence in his section of the service center (i.e., before the NYSHRL amendment became effective). (Mem. at 10–11.) Despite Verizon's contention, I find that the last incident contributing to Black's hostile work environment claim is, at least arguably, the warning she received from her superiors to stay away from Reiner. Still, the record places this event on October 10, 2019 (i.e., one day before the amendment to the NYSHRL became effective). (*See* Rule 56.1 Resps. Objs. ¶¶ 69–70) (Black "admit[s]" that this meeting occurred "on or about October 10, 2019"); Pl. Tr. 221:16–18 (testifying that the meeting happened "at the end of the day," "maybe about 5:00"); Documentation of Black Warning (email dated October 11, 2019 at 10:21 AM memorializing the meeting with Black and indicating that, by that time, the meeting had already occurred). Likewise, Black agrees in her Opposition that the "severe or pervasive" standard applies to both her Title VII and NYSHRL claims. (Opp'n at 3.)

Therefore, I analyze Black's NYSHRL claim under the pre-amendment standard. Under that standard, "claims brought under [the NYSHL] are analytically identical to claims brought under Title VII." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011).

**\*9**  When a plaintiff sues her employer for hostile work environment, the plaintiff "must show a specific basis for imputing the objectionable conduct to the employer." *Cain v. McDonough*, No. 23-7302-CV, 2024 WL 5165548, at \*1 (2d Cir. Dec. 19, 2024) (summary order) (citing *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015)). "An employer's liability for hostile work environment claims depends on whether the underlying harassment is perpetrated by the plaintiff's supervisor or the plaintiff's non-supervisory co-workers." *Id.* (citing *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015)). "When the harassment is attributable to a co-worker, the employer will be held liable only for its own negligence." *Id.* (citing *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998)). In such cases, the plaintiff must show either (1) that the "employer failed to provide a reasonable avenue for complaint" or (2) that the employer "knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Duch*, 588 F.3d at 762. In order to establish employer liability on a "fail[ure] to take appropriate remedial action" theory, the plaintiff must show (1) that "*someone* had actual or constructive knowledge of the harassment," (2) that "the knowledge of this individual can be imputed to the employer," and (3) that "the employer's response, in light of that knowledge, was unreasonable." *Id.* at 763.

## DISCUSSION

Verizon moves for summary judgment on Black's claims, arguing that no reasonable jury could find Verizon liable under Title VII or the NYSHRL.

First, Verizon argues that the record evidence cannot establish that the alleged conduct was sufficiently "severe or pervasive" to give rise to a Title VII or NYSHRL claim. (Mem. at 11–16.) As to severity, Verizon characterizes Reiner's statements as at most "mere offensive utterances" that do not create a hostile work environment. (Mem. at 12.) In support, it cites Second Circuit cases in which the Court found that, taking into account the totality of circumstances, conduct similar to that alleged here did not rise to a level of "severity" to be actionable under Title VII. *See Agosto v. New York City Dep't Educ.*, 982 F.3d 86, 103 (2d Cir. 2020) (allegations of supervisor suggestively licking a lollipop not sufficiently severe); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (no hostile work environment claim where claim was based on two isolated incidents: (1) the plaintiff's supervisor commenting on her posterior and (2) the supervisor using a piece of paper to touch the plaintiff's breast). As to pervasiveness, Verizon characterizes the alleged events as "two (2) isolated comments" by Reiner towards Black "that occurred approximately two (2) months apart," plus claims that Reiner "stared" at her. Mem. at 12; *see Agosto*, 982 F.3d at 102–03 (2d Cir. 2020) (allegations of occasional "star[ing]," "sneer[ing]," and "cat-call[ing] and clap[ping]" not sufficiently severe or pervasive); *Lewis v. City of Norwalk*, 562 F. App'x 25, 28 (2d Cir. 2014) (supervisor "licking ... his lips" and "leering" "sporadically over time" not sufficiently severe or pervasive); *Beiter v. Runyon*, 50 F. App'x 32, 35 (2d Cir. 2002) (summary order) (no hostile work environment claim where the supervisor's "objectionable conduct" included: (1) running his hand up and own plaintiff's arm and, later that same day, rubbing his hand over her back in the area of her bra strap; (2) telling plaintiff to limit her walking around because other supervisors were watching her; (3) being overly friendly with plaintiff and attempting to engage her in conversation about non-work matters; and (4) "walking through [plaintiff's] unit and watching [plaintiff] even when [the supervisor] was not assigned to that unit").

Verizon also cites a number of district court cases in which those courts determined that the conduct at issue was not sufficiently "severe or pervasive": *Alva v. Syosset Hosp.*, No. 13-cv-4849, 2018 U.S. Dist. LEXIS 126299, at \*13 (E.D.N.Y. July 26, 2018); *MacMaster v. City of Rochester*, No. 05-cv-6509, 2007 WL 2892015, 2007 U.S. Dist. LEXIS 72842 (W.D.N.Y. Sept. 28, 2007); *Godineaux v. LaGuardia Airport Marriott Hotel*, 460 F. Supp. 2d 413, 422–23 (E.D.N.Y. 2006); *DeSimone v. JP Morgan/Chase Bank*, No. 02-cv-7039, 2004 WL 2978011, 2004 U.S. Dist. LEXIS 25621 (S.D.N.Y. Dec. 22, 2004); *Spina v. Our Lady of Mercy Medical Ctr.*, No. 97-cv-4661, 2003 WL 22434143, at \*9 (S.D.N.Y. Oct. 22, 2003); *O'Dell v. Trans World Entm't Corp.*, 153 F. Supp. 2d 378, 386 (S.D.N.Y. 2001); *Dayes v. Pace Univ.*, 2 F. App'x 204, 207 (2d Cir. Feb. 5, 2001); *Holtz v. Rockefeller & Co., Inc.*, No. 96-cv-9484, 1999 WL 1043866, at \*4, 1999 U.S. Dist. LEXIS 17682, at \*5 (S.D.N.Y. Nov. 17, 1999).

**\*10**  Second, Verizon argues that no reasonable jury could find that Black experienced the alleged hostile work environment *because of* her sex. (Mem. at 13.) To the extent Reiner harassed Black, Verizon argues, it was because of his discovery that

her brother was one of the exonerated Central Park Five, not because of her sex. (Mem. at 13; *see also* Pl. Tr. 149:3–25 (Black testifying that the "leering" did not start until Reiner saw her on TV).) Verizon also points to employee [Redacted] (Mem. at 8; *see also* Investigation Report at D001377.)

Third, Verizon asserts that Black "suffered no material change to the terms or conditions of her employment" but does not support this argument with any reference to undisputed facts in the record or legal authority. (*See* Mem. at 1.)

Fourth, Verizon argues that, even if Black experienced a hostile work environment, she cannot, as a matter of law, hold Verizon liable because Reiner, the alleged harasser, was not her supervisor and no reasonable jury could find that Verizon failed to act sufficiently to stop the harassment. (Mem. at 16–18.) Verizon points to, among other things: (1) Verizon's Code of Conduct meant to address harassment and discrimination, of which Black testified she was aware (Mem. at 17; Pl. Tr. 245:17–20); (2) Pruitt's testimony that she reported the tattoo incident the day she witnessed it, and that Verizon subsequently conducted an investigation (Mem. at 18; Pruitt Tr. 19:9–25; Pruitt Report.); (3) Verizon supervisors' decision to instruct Reiner not to interact with Black during the pendency of the investigation (Mem. at 18; Oct. 2, 2019 Meeting Report I; Oct. 2, 2019 Meeting Report II); and (4) the supervisors' decision to provide Reiner with a warning and additional training following the conclusion of the investigation (Mem. at 18; Reiner Decl. ¶ 20.)

Black opposes summary judgment, arguing that there are genuine disputes of material fact relating to each of the issues identified by Verizon. Concerning Verizon's argument that no reasonable jury could find that the alleged conduct was sufficiently "severe or pervasive," Black cites her testimony suggesting that the conduct was both intense and frequent. (Opp'n at 5; Pl. Tr. 221:5–16 (testifying that other women referred to Reiner's conduct as "creepy"); Pl. Tr. 216:5–9 (testifying that his staring increased from once or twice per day to three or four times per day).) Black also cites her testimony that on one occasion she had to kneel on the floor behind a co-worker's desk to avoid Reiner's stare. (Opp'n at 5; Pl. Tr. 220:15–221:9.) She emphasizes that this conduct continued for 13 weeks and argues that the conduct was "sufficiently continuous and concerted" to meet the standard under Title VII and the NYSHRL. (Opp'n at 5 (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 139 (2d Cir. 1997)).)

Black cites *Kirkland v. Speedway LLC*, a Northern District of New York case where the court denied the defendant's motion for summary judgment over its employee's NYSHRL hostile work environment claim because a reasonable jury could consider "pervasive" the evidence indicating that the alleged harasser "was always staring and calling her 'hun' and 'baby girl.' " 260 F. Supp. 3d 211, 224 (N.D.N.Y. 2017). Black distinguishes *Alva, Spina, Holtz*, and *McMaster*, four of the cases cited by Verizon. (Opp'n at 6.) She also distinguishes *Iganamorte v. Cablevision Sys Corp.*, No. 03-cv-5973, 2006 WL 2711604, 2006 U.S. Dist. LEXIS 67872 (E.D.N.Y. Sept. 21, 2006), *Gonzalez v. Kahan*, No. 88-cv-922, 1996 WL 705320, 1996 U.S. Dist. LEXIS 22715 (E.D.N.Y. Nov. 15, 1996), and *Lamar v. Nynex Servs. Co.*, 891 F. Supp. 184, 185 (S.D.N.Y. 1995), three cases not cited by Verizon. (Opp'n at 7.) Black does not address five other cases cited by Verizon—*Godineaux, DeSimone, O'Dell, Dayes*, and *Quinn*. (*See generally* Opp'n.)

**\*11** As to whether Black's sex was the cause of the alleged hostile work environment, Black cites her testimony in which she stated her belief that Reiner's actions were motivated by his sexual attraction to her. (Opp'n at 4; Pl. Tr. 142:23–143:20.) She also points out that there is no evidence in the record indicating that Reiner stared at any men in the office, although at least one other woman, [Redacted], reported that Reiner stared at her. (Opp'n at 4; Investigation Report at D001377.)

As to whether the alleged harassment altered the terms and conditions of Black's employment, Black points to evidence in the record indicating (1) that the alleged harassment affected her relationship with her husband (Opp'n at 7; Pl. Tr. 112:16–114:7) and (2) that she ultimately took a disability leave of absence from her role at Verizon (Opp'n at 7; Pl. Tr. 225:4–6).

In response to Verizon's argument that it cannot be held liable for Reiner's conduct as Black's non-supervisor coworker, Black again argues that the harassment persisted for thirteen (13) weeks and that she had to move desks to avoid him. (Opp'n at 8.) She also argues that although Verizon opened an investigation into Reiner on or around July 11, 2019, it did not discipline Reiner until November 20, 2019. (Opp'n at 9; Reiner Decl. ¶¶ 14, 20.)

On reply, Verizon asks the Court to deem all facts proposed in its Rule 56.1 Statement as admitted, arguing that the denials raised by Black (regarding Paragraph 48, 51, 57, and 66) are "immaterial." (Reply at 2–4.) It also asks the Court to strike Black's Affidavit as inadmissible because it was not notarized or made under penalty of perjury pursuant to 28 U.S.C. § 1746. (*Id.* at 3.) Concerning the substance of Black's claims, Verizon argues again that no reasonable jury could find that the alleged conduct was sufficiently "severe or pervasive" under Title VII and NYSHRL. (Reply at 5–8.) Verizon contends that Black failed to address certain cases cited in its opening brief and disagrees with Black's attempts to distinguish other cases. (*Id.*) Verizon also suggests that the "terms and conditions of [Black's] employment" were not altered by the alleged harassing conduct, but rather by other factors in Black's life. (Reply at 8.) In particular, it cites portions of Black's deposition testimony where she stated that around the same time her sister was in the hospital being treated for cancer (Pl. Tr. 238–239), that she was concerned that her husband was being unfaithful (*id.* at 256:4–12), and that she had been taking medication "on and off" for following her PTSD diagnosis in 2002 (*id.* at 256:13–257:1.) Finally, Verizon reasserts its position that there is not a sufficient basis to hold it liable for Reiner's conduct as a non-supervisor employee, maintaining that "[w]henever [Black] raised a concern, it was appropriately addressed by Verizon." (Reply at 9–10.)

As explained below, I find that there are disputed issues of material fact as to all of the issues Verizon identified.

### I. Threshold Evidentiary Issues
Verizon raises two threshold matters that I must address before reaching the merits of its Motion.

First, Verizon argues that I should deem as "admitted" *all* facts set forth in its Rule 56.1 Statement, on the ground that, in Verizon's view, the four facts that Black "denied" in her response (Rule 56.1 Resps. Objs. ¶¶ 48, 51, 57, 66) are immaterial to the resolution of Verizon's summary judgment motion. (Reply at 2–4.) As an initial matter, Local Rule 56.1 directs the movant on summary judgment to provide a "statement ... of the *material* facts as to which the moving party contends there is no genuine issue to be tried." *Id.* (emphasis added.) If Verizon had thought these four disputed facts were not material, then it should not have included them in its Rule 56.1 Statement. Verizon relies on *Guzman v. Crothall Healthcare Inc.*, No. 17-cv-4306, 2021 WL 5048993 (E.D.N.Y. Sept. 29, 2021) for its position that all facts in its Rule 56.1 Statement should be admitted. *Guzman*, however, is inapposite. There, the court deemed a fact admitted where the plaintiff's stated basis for denying knowledge as to whether two employees reviewed certain records "d[id] not materially dispute" the fact proposed in the Rule 56.1 Statement. *Id.* at *3 n.15. Here, the record materially disputes the facts presented in the four paragraphs of Verizon's Rule 56.1 Statement that Black "denied." (Rule 56.1 Resps. Objs. ¶¶ 48, 51, 57, 66) For example, in Paragraph 57, Verizon cites Reiner's deposition testimony to advance the fact that Reiner complied with Nichols' directive to stay away from Black. (*Id.* ¶ 57; Reiner Tr. 15:13–17.) Black, however, testified that Reiner did not comply and, in fact, that his leering increased to three to four times per day after he received that directive. (Pl. Tr. 216:5–17.) Accordingly, I do not deem the four "denied" paragraphs as "admitted," and rely on the factual record submitted, as I am required to do.

**\*12** Second, Verizon asks me to strike Black's Affidavit on the ground that it was not notarized or made under penalty of perjury pursuant to 28 U.S.C. § 1746. (Reply at 4–5.) Verizon is incorrect. 28 U.S.C. § 1746 provides, in relevant part, that an unsworn declaration has the same force as a sworn declaration where the declarant attests to substantially the following: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date)." 28 U.S.C. § 1746(2). In her declaration, Black attests: "I swear or affirm that the above and foregoing representations are true and correct to the best of my information, knowledge, and belief." (Pl. Aff. at 4.) While Black does not directly copy or cite 28 U.S.C. § 1746, I find that her declaration substantially complies with the statute's requirements. Therefore, Black's declaration is admissible. [8]

### II. Whether the Alleged Conduct Was Sufficiently "Severe or Pervasive" to Constitute a Hostile Work Environment under Title VII and the NYSHRL
Although there is no genuine dispute as to whether the alleged conduct was sufficiently "severe," there is a genuine dispute as to whether it was sufficiently "pervasive."

Concerning severity, as a matter of law, the conduct at issue is not severe enough to be actionable under Title VII or the NYSHRL (before it was amended in 2019). The record, when read in the light most favorable to Black, contains facts supporting seven examples of harassment:

(1) on May 26, 2025, Reiner told Black that he saw a "beautiful" woman on TV the night before and inquired whether that woman was her (Pl. Tr. 117:22–118:2, 130:21–23);

(2) sometime between May 26, 2025 and July 11, 2025, Reiner told Black that he knew she and her brother had different fathers (which suggested to Black that Reiner had been researching her family) and said that this meant he was not her "real brother" (*id.* at 155:18–22, 157:2–158:3);

(3) between May 26, 2025 and roughly July 11, 2025, Reiner stared at Black once or twice per day (*id.* at 216:5–17);

(4) on July 11, 2025, Reiner asked about the tattoo on Black's breast, twice using the term "boob" (*id.* at 173:6–19);

(5) from around July 12, 2025 to October 9, 2025, Reiner stared at Black three to four times per day, including going out of his way to pass her desk (*id.* at 216:5–17; 221:5–16; 224:14–22);

(6) on October 9, 2025, while Black was speaking to her friend, Reiner glared at her, causing Black to hide behind her friend's desk (*id.* at 220:20–221:3); and

(7) on October 9, 2025, Reiner disingenuously reported that Black's presence near his cubical was making him uncomfortable (Investigation Report at D001371).

None of these alleged instances of harassment, individually or taken together, meets the Second Circuit's standard for severity. *See Agosto*, 982 F.3d at 102–03 ("star[ing]," "sneer[ing]," and "cat-call[ing]" not sufficiently severe); *Quinn*, 159 F.3d at 768 (supervisor making a single comment about the plaintiff's posterior and using a piece of paper to touch the plaintiff's breast not sufficiently severe); *Lewis*, 562 F. App'x at 28 (2d Cir. 2014) (supervisor "licking ... his lips" and "leering" not sufficiently severe); *Beiter*, 50 F. App'x at 35 (summary order) (no hostile work environment claim where the plaintiff's supervisor, among other things, attempted to engage her in conversation about non-work matters and "walk[ed] through [plaintiff's] unit and watch[ed] [plaintiff] even when [the supervisor] was not assigned to that unit").

**\*13** However, viewing the record in the light most favorable to Black, I find that a reasonable jury could conclude that the alleged harassing conduct was sufficiently pervasive to establish liability under Title VII and the NYSHRL. In particular, there are genuine disputes over the frequency and duration of Reiner's actions. With respect to frequency, Black's testimony contradicts Verizon's claim that the conduct was limited to "two (2) isolated comments that occurred approximately two (2) months apart" plus "sex-neutral staring." (*See* Mem. at 12, 14.) Black testified that Reiner glared at her approximately once or twice per day from May 26, 2019 to July 11, 2019, and that his glaring actually *increased* after Nichols spoke to Reiner about his behavior on July 12, 2019, to approximately three to four times per day. (Pl. Tr. 216:5–17.) With respect to pervasiveness, Black's testimony also gives rise to questions of material fact about whether Reiner's alleged harassing behavior continued well past July 2019 to the commencement of Black's leave on October 10, 2019. Specifically, Black testified:

> I mean, for me, this is months of me complaining, moving my desk, contacting the union, contacting HR, doing everything I could to stop him, I just want to work, just want to do my job, just want to try to continue to live, and what I was feeling at that time with my family, I was happy, and he took all of that away from me.

(Pl. Tr. 224:14–22.)

Therefore, viewing the record in the light most favorable to Black and resolving all ambiguities and drawing all reasonable inferences against Verizon, as the Court is required to do at summary judgment, *Cunningham*, 86 F.4th at 980, a reasonable jury could conclude that the conduct alleged was "sufficiently pervasive" or a "sufficient combination of" severe and pervasive under Title VII and the NYSHRL. *Redd v. New York Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012); *see also Messer v. Fahnestock & Co. Inc.*, No. 03-cv-4989, 2008 WL 4934608, at *9 (E.D.N.Y. Nov. 18, 2008) (summary judgment denied where supervisor, among other things, "leered at [plaintiff] in a sexual kind of way" for "approximately five to six months").

The Second Circuit cases on which Verizon relies are distinguishable. In *Quinn*, the Second Circuit upheld the district court's grant of summary judgment for the defendant, finding that the majority of the alleged harassing incidents were barred by the statute of limitations and that the remaining two discrete incidents—in which the plaintiff's supervisor made a lewd comment about the plaintiff's posterior and used papers to touch her breasts—were neither severe nor pervasive enough to establish a hostile work environment claim. 159 F.3d at 768. Similarly, in *Lewis*, the Second Circuit affirmed the district court's grant of summary judgment where the alleged "leering" occurred "no more than a few times *a year*." 562 F. App'x at 28 (emphasis added). In *Agosto*, the Second Circuit held that allegations of a supervisor's "star[ing]," "sneer[ing]," "cat-call[ing]," and "clap[ping]" "on *a few occasions* over the course of a year" and an individual incident in which the supervisor suggestively licked a lollipop did not meet the "severe or pervasive" standard. 982 F.3d at 102–03 (emphasis added). In *Beiter*, the plaintiff's supervisor touched her arm once and then, in a separate incident on the same day, her back once. 50 F. App'x at 35. The supervisor also yelled at the plaintiff in one instance and subsequently watched her because he thought she was taking too many breaks. *Id.* The Second Circuit upheld the district court's grant of summary judgment, finding, among other things, that the conduct was not "explicitly sexual." *Id.* at 36. In *Dayes v. Pace University*, the Second Circuit held that "a handful of comments ... interspersed over a one-year period and uniformly mild in tone" did not create a hostile work environment. 2 F. App'x at 207. Here, by contrast, viewing the facts in the light most favorable to Black, Reiner leered at her multiple times a day from May 2019 to October 10, 2019, and on at least one occasion, made an explicit comment about her breasts. (Pl. Tr. 172:19–173:3, 216:5–17.)

  **\*14**  The district court cases on which Verizon relies are not binding authority and, in any event, are likewise distinguishable. *Alva*, 2018 U.S. Dist. LEXIS 126299, at *13 (report and recommendation by magistrate judge, case settled before district judge ruling); *MacMaster*, 2007 WL 2892015, at *9, 2007 U.S. Dist. LEXIS 72842, at *27 (granting summary judgment where supervisor commented that plaintiff would "look hot" in coveralls and putting his arm around plaintiff's shoulder occurred "[o]n occasions over ... [a] decade"); *Godineaux*, 460 F. Supp. 2d at 422–23 (E.D.N.Y. 2006) (granting summary judgment where alleged harassing conduct occurred in a "few incidents ... over a span of several months"); *DeSimone*, 2004 WL 2978011, at *7, 2004 U.S. Dist. LEXIS 25621, at *21 (granting summary judgment where alleged harassing conduct occurred over a period of six weeks); *Spina*, 2003 WL 22434143, at *3 (granting summary judgment where plaintiff could recall, at most, six instances of harassment over the course of 15 months); *O'Dell*, 153 F. Supp. 2d at 386 (granting summary judgment where employee expressed his interest in plaintiff and pursued her); *Holtz v. Rockefeller & Co., Inc.*, 1999 WL 1043866, at *4, 1999 U.S. Dist. LEXIS 17682, at *5 (reversed on appeal).


### III. Whether the Alleged Conduct was Because of Black's Sex

There are material factual disputes concerning whether Reiner's alleged behavior was based on Black's sex, as opposed to some other reason. According to Verizon, Reiner's interest in Black was non-sexual and based on his discovery that she was the sister of one of the exonerated Central Park Five. (Mem. at 13; *see also* Pl. Tr. 149:3–25.) According to Black, while Reiner's alleged harassing behavior only began after he made this discovery, Black understood that he had developed a "sexual attraction" to her, "but in a hostile way." (Pl. Tr. 157:2–158:3.) The record shows that while [Redacted], another female employee, reported that Reiner stared at her, there is no evidence he stared at any male employees. (Investigation Report at D001377.) Thus, there is a triable issue of fact as to whether there is a sufficient nexus between the alleged hostile work environment and the protected characteristic at issue here (i.e., Black's sex).


### IV. Whether the Alleged Conduct Caused a Material Change to the Terms and Conditions of Black's Employment

There is a material factual dispute concerning whether the alleged hostile work environment caused a material change to the terms and conditions of Black's employment. Both parties appear to agree that taking a disability-based leave of absence constitutes a material change to the terms and conditions of one's employment, but the parties disagree over the cause of Black's need to go on disability-based leave. While Black argues that the alleged hostile work environment triggered the disability leave, Verizon raises potential other reasons—namely, Black's sister's illness, Black's concerns related to her marriage, and Black's prior PTSD diagnosis. (Opp'n at 7; Reply at 8.) This, too, is a triable issue of fact for the jury.

### V. Whether Verizon Can Be Held Liable for Reiner's Conduct as a Non-Supervisor Employee

Finally, there are disputed questions of material fact bearing on whether Verizon can be held liable for Reiner's conduct, given that he was not Black's supervisor. Black cites various portions of the record to support her argument that Verizon did not act sufficiently promptly and diligently to address the following issues: (1) that Reiner's staring continued for 13 weeks after she first reported his behavior to Nichols (Pl. Tr. 216:5–9); (2) that, after reporting the behavior, Black had to move desks, which still proved to be ineffective (Pl. Tr. 200:24–201:6, 203:11–21, 219:9–225:22); and (3) that Verizon did not conclude its investigation and discipline Reiner until November 2019, approximately six months after the first incident in May 2019 and four months after Black first reported his behavior in July 2019 (Reiner Decl. ¶ 17). Verizon, by contrast, cites evidence supporting its argument that it "appropriately addressed" all of Black's allegations: (1) Pruitt's testimony that she reported Reiner's conduct when she overhead him refer to Black's "boob" (Pruitt Tr. 17:2–17); (2) Black's testimony that Verizon granted her request to switch desks (Pl. Tr. 203:11–21); (3) documentary evidence that both Nichols and Murray told Reiner to stay away from Black (Pl. Tr. 186:15–21, 187:10–12, 193:14–22; Reiner Tr. 15:6–12; Oct. 2, 2019 Meeting Report I); (4) Reiner's statement in his declaration that he was disciplined for unprofessional workplace conduct (Reiner Decl. ¶ 17); and (5) Black's testimony that, following these incidents, Verizon made its Garden City service center employees undergo additional training on Verizon's Code of Conduct (Pl. Tr. 246:2–6.).

**\*15** Accordingly, there is a genuine dispute over whether Verizon's remedial response was sufficiently "unreasonable" to give rise to liability for Reiner's conduct as an employee in a non-supervisory role. *Duch*, 588 F.3d at 763.

### CONCLUSION

For the reasons stated above, genuine questions of material fact preclude a determination as a matter of law as to Black's hostile work environment claims under Title VII and the NYSHRL. Accordingly, I deny Verizon's Motion for Summary Judgment (ECF No. 65).

### All Citations

Slip Copy, 2025 WL 888477

---

### Footnotes

1    As discussed below at Legal Standards Section II, the New York legislature amended the NYSHRL to remove the requirement that that the alleged conduct be "severe or pervasive." However, as the parties agree that the alleged harassing conduct in this case occurred before this change of law, the prior "severe or pervasive" standard applies to Black's NYSHRL claim.

2    In her deposition, Black testified that this incident happened "in or around early August 2019" but that she could not remember the exact date. (Pl. Tr. 151:14–152:10.) However, documentary evidence indicates that it happened on July

11, 2019, and in her Rule 56.1 Responses, Black admits that it happened on July 11, 2019. (*See* Dobson Decl. Ex. 8, July 11, 2019 Case Detail Hotline Report, ECF No. 65-10; Rule 56.1 Statement Resps. Objs. ¶ 46, ECF No. 66-1.)

3    Black's Opposition to Verizon's Motion for Summary Judgment asserts that Black moved desks twice, but the record does not identify when Black moved desks a second time. (Opp'n Mot. Summ. J. ("Opp'n") at 9, ECF No. 66 (arguing that "Plaintiff was forced to move her desk twice" with no citation to the record).)

4    Verizon's investigation report into Reiner's conduct recites a part of this email. (Investigation Report at D001371.) In her Responses & Objections to Verizon's Rule 56.1 Statement, Black admits that Reiner wrote this email. (Rule 56.1 Resps. Objs. ¶ 68.) The email itself, however, is not in the record provided by the parties to the Court on Verizon's Motion for Summary Judgment.

5    Verizon did not file Exhibit 7 on the public docket as a part of Verizon's fully briefed Motion for Summary Judgment but filed this document under seal in support of Verizon's letter motion seeking a pre-motion conference in anticipation of its Motion for Summary Judgment.

6    Verizon did not file Exhibit 11 on the public docket as a part of Verizon's fully briefed Motion for Summary Judgment but filed this document under seal in support of Verizon's letter motion seeking a pre-motion conference in anticipation of its Motion for Summary Judgment.

7    Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, brackets, and citations.

8    Verizon's objection to Black's Affidavit is irrelevant to my decision, in any event, since the two facts for which this Order cites Black's Affidavit are also supported by other record evidence. Black's attestation, "I have a tattoo on my left breast that is not visible unless you are looking down my shirt," is also found in her deposition testimony. (*See* Pl. Aff. ¶ 11; Pl. Tr. 172:15–16 ("I have never made [it] visible in my office.").) And Black's attestation that she began her leave of absence "on or around October 10, 2019" echoes statements by Verizon in its Rule 56.1 Statement. (*See* Pl. Aff. ¶ 33; Rule 56.1 Statement ¶¶ 69–70.)

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 754147

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

Shamara Bailey BORDEN, Plaintiff,

v.

The CITY OF NEW YORK, Defendant.

23-CV-8330 (RPK) (CLP)

|

Signed March 10, 2025

**Attorneys and Law Firms**

David J. De Toffol, Joshua Gittleman, DeToffol & Gittleman, Attorneys at Law, New York, NY, for Plaintiff.

Eric Daniel Arbizo, NYC Law Department, New York, NY, for Defendant.

## MEMORANDUM AND ORDER

RACHEL P. KOVNER, United States District Judge:

 **\*1**  Plaintiff Shamara Bailey Borden was employed by the New York City Administration for Children's Services ("ACS") from 2017 until her resignation in June 2023. Plaintiff alleges that she was sexually harassed by two different supervisors and that as a result she felt forced to resign. In this lawsuit, she brings claims for a hostile work environment based on her sex and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; as well as claims for sexual harassment and retaliation under the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*

Defendant moves for partial dismissal, arguing that plaintiffs' claims are time barred in part, that plaintiff has not plausibly alleged a hostile-work-environment claim under Title VII or the NYSHRL, and that plaintiff has not plausibly alleged that she was constructively discharged. Defendant's motion is granted.

## BACKGROUND

The following facts are taken from plaintiff's amended complaint and are assumed true for the purposes of this order.

Plaintiff was employed by ACS between 2017 until her resignation in June 2023. Am. Compl. ¶¶ 17, 50 (Dkt. #11). She was hired as an officer and then promoted to a sergeant in 2019. Am. Compl. ¶¶ 17–18. During the course of her employment, plaintiff's amended complaint alleges that she was subjected to sexual harassment by two supervisors: Gary Sylvester and David Inshiqaq.

### A. Plaintiff's Allegations About Gary Sylvester

On April 12, 2020, Sylvester "remarked to Plaintiff that her stoic and professional behavior might lead some individuals who are not acquainted with her to perceive her as aggressive." Am. Compl. ¶ 20. He "suggest[ed] that a night with him would change this perceived 'aggressiveness', asserting 'I take you home and tender you right on up and all that aggression would go right out the window.'" *Ibid.* That same week, Sylvester made unsolicited comments to plaintiff about how a "female caller

had allegedly expressed interest in a threesome with him," continuing on to "describe graphically and vulgarly the hypothetical threesome." *Id.* ¶¶ 21–22. After these incidents, plaintiff filed an Equal Employment Opportunity ("EEO") complaint with the Executive Director of Administration and the EEO officer, but no responsive action was taken. *Id.* ¶¶ 23–24.

In July 2020, plaintiff followed up with the Director of Administration and Senior Assistant Commissioner. *Id.* ¶ 25. The Director of Administration informed plaintiff that, for her claim against Sylvester to "gain traction," she would need "smoking gun" evidence. *Ibid.* The Senior Assistant Commissioner assured plaintiff that he would engage with Sylvester about her complaints and follow-up, but never did. *Id.* ¶ 29.

**B. Plaintiff's Allegations About David Inshiqaq**
On March 9, 2022, during a conversation about snack preferences, plaintiff mentioned to Inshiqaq that she enjoyed pickles. *Id.* ¶ 30. Inshiqaq responded by "stating his keen interest in watching her eat a pickle," going so far as to "suggest[ ] he would replay camera footage to witness the act." *Id.* ¶¶ 30–31. About nine months later, in December 2022, Inshiqaq approached plaintiff from behind, rested his chin on her head, and referenced her upcoming gastric sleeve surgery by mentioning that he "like[d] her extra weight" while caressing her arm. *Id.* ¶ 33. Plaintiff also alleges that in November 2022, she applied for a promotion to a lieutenant position within the department, but the position was given to someone else who Inshiqaq told plaintiff was "pre-selected." *Id.* ¶ 32. Plaintiff reported Inshiqaq's behavior to Chief James Perrino, who advised plaintiff against making a complaint because "the individuals positioned to review and address the complaint were friends and close associates of" Inshiqaq. *Id.* ¶ 34.

**\*2** On April 14, 2023, plaintiff told Inshiqaq that she was considering resigning. *Id.* ¶ 35. Plaintiff indicated that she was "alternatively seeking to be transferred" from her current role, to get away from Inshiqaq. *Ibid.* Inshiqaq denied her request for a transfer. *Id.* ¶ 36. Plaintiff sought Chief Perrino's intervention, but he declined to act, telling her that any transfer would require Inshiqaq's approval. *Id.* ¶ 38. Plaintiff eventually secured a competing job offer within ACS, but Inshiqaq intentionally changed her work schedule in order to prevent her from attending a required event, forcing her to turn down the offer. *Id.* ¶ 40.

A week after this incident, Inshiqaq requested that Chief Perrino grant plaintiff's request to be transferred to a field position. *Id.* ¶ 41. In a conversation on April 24, 2023, plaintiff confirmed with Chief Perrino that this transfer occurred solely based on Inshiqaq's recommendation. *Id.* ¶ 42.

After plaintiff's transfer, Inshiqaq ensured that plaintiff worked under Inshiqaq's direct supervision. *Id.* ¶ 43. Specifically, he "manipulated work assignments to compel [plaintiff] to act as his driver and escort for approximately six to seven full days." *Id.* ¶ 44. Plaintiff was required to endure "extensive one-on-one interaction" with Inshiqaq, including ferrying him to and from his residence and accompanying him to official engagements like funerals and job fairs. *Ibid.* These assignments were not within plaintiff's regular job duties and were inconvenient, due to the distance between plaintiff's new duty station and Inshiqaq's residence. *Id.* ¶ 45. Plaintiff alleges that these duties would ordinarily be viewed as optional assignments, rather than mandatory, and that Inshiqaq deviated from normal practice in order to harass her. *Id.* ¶ 46. Inshiqaq told plaintiff that "no matter where she goes, he is her boss." *Id.* ¶ 47.

A few weeks after the transfer, Chief Perrino informed plaintiff that she would be reassigned to work full-time under Inshiqaq. *Id.* ¶ 48. When she objected, her upcoming interview for a promotion was abruptly cancelled, which she believed to be a penalty for opposing Inshiqaq's discriminatory and harassing conduct. *Id.* ¶ 49.

By June 2023, plaintiff decided to tender her resignation. *Id.* ¶ 50. When she informed Chief Perrino, he asked her to hold off on submitting her resignation, promising her a solution to her grievances regarding Inshiqaq's conduct. *Id.* ¶¶ 51–52. Despite this promise, he did not follow-up, and plaintiff proceeded with her planned resignation from ACS. *Id.* ¶ 53.

**C. Procedural History**

Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") on August 21, 2023. *See* Decl. of Eric Arbizo, Ex. 1 (Dkt. #18-2). [1] After receiving notice of her right to sue from the EEOC, Am. Compl. 15, she filed this lawsuit on November 9, 2023, *see* Compl. (Dkt. #1). She brings claims for sex-based hostile work environment under Title VII and the NYSHRL, sexual harassment under the NYCHRL, and retaliation under all three laws. Am. Compl. ¶¶ 59–77.

**\*3** Defendant now moves to partially dismiss plaintiff's complaint. Def.'s Mem. of L. in Supp. of Partial Mot. to Dismiss ("Def.'s Mot.") (Dkt. #18). *First*, defendant moves to dismiss all of plaintiff's claims to the extent they rely on the conduct of Gary Sylvester as time-barred. *Id.* at 7–9. *Second*, defendant moves to dismiss plaintiff's hostile-work-environment claims under Title VII and the NYSHRL because plaintiff has not plausibly alleged that Inshiqaq engaged in harassment that was severe or pervasive. *Id.* at 9–14. And *third*, defendant moves to dismiss plaintiff's constructive discharge claim because plaintiff has not plausibly alleged working conditions so intolerable that a reasonable person would have felt compelled to resign. *Id.* at 14–17. Defendant does not move to dismiss plaintiff's remaining claims, which consist of sexual harassment under the NYCHRL and retaliation under Title VII, the NYSHRL, and the NYCHRL. *See* Am. Compl. ¶¶ 64–65, 69–77.

### STANDARD OF REVIEW

When evaluating a motion for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (citation omitted). To avoid dismissal, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint, in other words, must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. While the plausibility standard "is not akin to a 'probability requirement,' " it requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

### DISCUSSION

Defendant's motion for partial dismissal is granted.

### I. Claims Based on Sylvester's Conduct Are Time Barred

Defendant moves to dismiss plaintiff's claims, to the extent they are based on conduct by Gary Sylvester, as time barred. The motion is granted.

### A. Title VII

As a prerequisite to filing suit under Title VII, individuals alleging employment discrimination must "file a charge with the EEOC within 180 or, in states like New York that have local administrative mechanisms for pursuing discrimination claims, 300 days 'after the alleged unlawful employment practice occurred.' " *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e–5(e)(1)). "[T]he word 'practice' in this context refers to 'a discrete act or single "occurrence," ' " and ... a 'discrete retaliatory or discriminatory act "occurred" on the day that it "happened." ' " *Id.* at 79 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110–11 (2002)). "For plaintiffs alleging unlawful discrimination or retaliation, discrete actions such as 'termination, failure to promote, denial of transfer, or refusal to hire are easy to identify' and are 'not actionable if time barred, even when they are related to acts alleged in timely filed charges.' " *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023) (quoting *Morgan*, 81 F.4th at 114–15).

"Claims alleging a hostile work environment require a different analysis than discrimination or retaliation claims because '[t]heir very nature involves repeated conduct.' " *Banks*, 81 F.4th at 259–60 (quoting *Morgan*, 536 U.S. at 115). "Unlike discrete discriminatory or retaliatory actions, incidents that give rise to a hostile work environment 'occur[ ] over a series of days or perhaps years and ... a single act of harassment may not be actionable on its own.' " *Id.* at 260 (quoting *Morgan*, 536 U.S. at 115). "[C]onsideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Morgan*, 536 U.S. at 105.

 **\*4** Accordingly, if any act alleged to contribute to a hostile work environment "falls within the statutory time period," the court must "determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice." *Morgan*, 536 U.S. at 120; *see McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 76 (2d Cir. 2010). If so, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Morgan*, 536 U.S. at 117. This inquiry "turns on whether the timely and untimely actions are 'sufficiently similar in kind.' " *Sylla v. N.Y.C. Dep't of Educ.*, 664 F. Supp. 3d 311, 324 (E.D.N.Y. 2023) (quoting *Richard v. N.Y.C. Dep't of Educ.*, No. 16-CV-957 (MKB), 2017 WL 1232498, at \*14 (E.D.N.Y. Mar. 31, 2017)). Factors courts consider for the relatedness determination include "the similarity of the environment in which the incidents took place, the nature of the incidents, and the temporal discontinuity of the incidents." *Kocar v. Port Auth. of N.Y. & N.J.*, No. 19-CV-11508 (AT), 2022 WL 624070, at \*5 (S.D.N.Y. Mar. 2, 2022) (citing *McGullam*, 609 F.3d at 77, 82). Ultimately, the relatedness inquiry is "an individualized assessment," owing to the "fact-specific and sensitive" nature of hostile-work-environment claims. *McGullam*, 609 F.3d at 77.

Here, the offending conduct by Sylvester occurred in April 2020, and is not encompassed in the 300-day period covered by plaintiff's August 21, 2023 EEOC charge. *See* Am. Compl. ¶¶ 19–29. This Court's job is accordingly to determine whether Sylvester's conduct is "sufficiently related" to the later actions by Inshiqaq such that they can be said "to be part of the same alleged hostile work environment practice."[2] *McGullam*, 609 F.3d at 77.

It is not. Plaintiff alleges that Sylvester made unwelcome comments of a sexual nature to her on two separate occasions within the span of a single week in April 2020. *See* Am. Compl. ¶¶ 20–22. By contrast, she alleges that Inshiqaq engaged in a campaign of harassment between March 2022 and her resignation in June 2023 that consisted of sexual comments, but also physical touching, interference with plaintiff's career, and a transfer to less desirable job duties under Inshiqaq's control. *See id.* ¶¶ 30–50. The fact that the conduct was perpetrated by two different supervisors, the differences in the nature of the two supervisors' allegedly discriminatory behavior, and the nearly two-year gap between Sylvester's conduct and Inshiqaq's, apparently without any intervening incident, together establish that Sylvester's conduct is not sufficiently related to Inshiqaq's to constitute the same alleged hostile-work-environment practice. *See Kocar*, 2022 WL 624070, at \*6 (finding dissimilar instances of discriminatory conduct perpetrated by different employees with "no overlap in perpetrators within and outside the limitations period" separated by multiple years to not constitute the same hostile work environment); *Armstrong v. Metro. Transp. Auth.*, No. 07-CV-3561 (DAB), 2015 WL 992737, at \*4 (S.D.N.Y. Mar. 3, 2015) (concluding "difference[s] in perpetrators, supervisors, unit assignment, and type of harassment" precluded finding of relatedness); *see also McGullam*, 609 F.3d at 78 ("Although [an] incident-free interval [of one year] does not preclude relatedness, it renders less plausible the notion that the sleep-over comment is of a piece with the production department conduct.").

 **\*5** Plaintiff argues in the alternative that, even if Sylvester's conduct is not actionable as part of plaintiff's hostile-work-environment claim, it should still be admissible as "background evidence" in support of plaintiff's timely claims. Pls.' Opp'n 7–8. "[A]n employee is not barred 'from using ... prior acts as background evidence in support of a timely claim,' " even if claims based on those prior acts would be time barred. *McGullam*, 609 F.3d at 79 (quoting *Morgan*, 536 U.S. at 113); *see Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176–77 (2d Cir. 2005) (explaining the role background evidence of time barred conduct plays in the consideration of timely claims). Accordingly, the Court will consider plaintiff's allegations about Sylvester's conduct as background evidence for plaintiff's timely claims, to the extent they are relevant.

## B. NYSHRL and NYCHRL

"[C]laims under the NYSHRL and the NYCHRL are time-barred unless filed within three years of the alleged discriminatory acts." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007). The Second Circuit has not decided whether the statute of limitations under the NYSHRL and NYCHRL is tolled while a complaint is pending with the EEOC, *see Shoejae v. Harlem Hosp. Ctr.*, 764 F. App'x 113, 114 n.2 (2d Cir. 2019), but the "clear trend" among district courts is that "filing an EEOC charge does toll those claims," *Schneider v. Wal-Mart Stores, Inc.*, No. 16-CV-2010 (NSR), 2019 WL 294309, at *3 (S.D.N.Y. Jan. 23, 2019) (citing cases). Because plaintiff filed her EEOC charge on August 21, 2023, claims based on conduct occurring prior to August 21, 2020 are time barred.

In *Morgan*, the Supreme Court analyzed the timeliness of a hostile-work-environment claim under Title VII. *See Morgan*, 536 U.S. at 104. Courts apply the same analysis when assessing the timeliness of hostile-work-environment claims brought under the NYSHRL and NYCHRL. *See, e.g.*, *Banks*, 81 F.4th at 260–61 (applying *Morgan* to analyze the timeliness of a hostile-work-environment claim under the NYSHRL); *Abdelal v. Kelly*, 726 F. App'x 8, 11–12 (2d Cir. 2018) (applying *Morgan* to analyze the timeliness of hostile-work-environment claims brought under the NYSHRL and NYCHRL); *Drew v. Plaza Constr. Corp.*, 688 F. Supp. 2d 270, 278–79 (S.D.N.Y. 2010) (same). Accordingly, for the same reasons that apply to plaintiff's Title VII claims, plaintiffs' NYSHRL and NYCHRL claims are time barred to the extent they rely on allegations about Sylvester's conduct as well.

## II. Plaintiff Has Not Plausibly Alleged a Hostile Work Environment

Defendant moves to dismiss plaintiff's hostile-work-environment claims under Title VII and the NYSHRL for failure to state a claim. The motion is granted.

## A. Title VII

"To state a claim for a hostile work environment in violation of Title VII," a plaintiff must plead facts tending to show that the complained of conduct: "(1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quotation marks, ellipsis, and citation omitted). To determine whether the environment is sufficiently abusive, "a district court considers the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 287 (2d Cir. 2020) (quotation marks, brackets, and citation omitted). The Second Circuit "treats the first two of these factors—the frequency and the severity of the misconduct—as the principal focus of the analysis; the last three factors are specific considerations within the severity inquiry." *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quotation marks and citation omitted). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Ibid.* Finally, "[i]t is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015).

**\*6** Plaintiff's non-time barred allegations do not plausibly amount to a hostile work environment. To begin, plaintiff does not allege that much of the conduct of which she complains "occurred because of a protected characteristic"—her sex. *Ibid.* "Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex." *Alfano*, 294 F.3d at 378. "But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." *Ibid.* "Incidents, however abusive, that are not gender-related are not relevant to establish a claim" of

a hostile work environment. *Beale v. Mt. Vernon Police Dep't*, 895 F. Supp. 2d 576, 587 (S.D.N.Y. 2012) (quoting *Casalino v. N.Y. State Cath. Health Plan, Inc.*, No. 09-CV-2583 (LAP), 2012 WL 1079943, at *7 (S.D.N.Y. Mar. 30, 2012)).

Many of plaintiff's allegations amount to dissatisfaction with scheduling decisions, work assignments, and missed promotions. In November 2022, plaintiff alleges that she was not selected for a promotion she had sought. Am. Compl. ¶ 32. In April 2023, plaintiff asked Inshiqaq for a transfer away from his command but was denied. *Id.* ¶¶ 35–36. Soon after, Inshiqaq changed plaintiff's work schedule to prevent her from attending an event she needed for a different job offer. *Id.* ¶ 40. Between late April 2023 and when plaintiff quit in June, Inshiqaq manipulated plaintiff's schedule so that she would work more closely under him in less favorable assignments. *Id.* ¶¶ 43–50. Two weeks before she quit, plaintiff also learned that Chief Perrino was planning to reassign her to work full time under Inshiqaq—when she objected, an interview for a promotion was cancelled. *Id.* ¶¶ 48–49. Plaintiff's complaints about Inshiqaq's conduct to Chief Perrino went unanswered. *Id.* ¶¶ 34, 38, 49, 51–53.

Plaintiff does not plausibly allege that these incidents were related to her sex or the earlier harassment she experienced at the hands of Inshiqaq. Notably, plaintiff does not allege that Inshiqaq ever sexually harassed plaintiff after December 2022, including during the time after she was transferred to work more closely under his supervision. These therefore did not contribute to a hostile work environment on the basis of plaintiff's sex. *See Beale*, 895 F. Supp. 2d at 587–88 (finding that instances of supervisor yelling at plaintiff for non-sex-based reasons did not contribute to hostile work environment based on sex, despite same supervisor on other occasions engaging in sex-based harassment); *cf. Sanderson v. Leg Apparel LLC*, No. 19-CV-8423 (GHW), 2020 WL 3100256, at *6, 8–9 (S.D.N.Y. June 11, 2020) (finding that black plaintiff had met his burden to plead that his heavier workload contributed to race-based hostile work environment claim because he alleged that similarly situated white colleagues were not assigned as much work).

What remains are plaintiff's allegations that Inshiqaq, plaintiff's supervisor, twice targeted plaintiff with unwelcome sexual innuendos: in March 2022 and again approximately nine months later in December. Am. Compl. ¶¶ 30–31, 33. On the second occasion, Inshiqaq also grabbed plaintiff from behind, resting his chin on her head and caressing her arm. *Id.* ¶ 33.

Inshiqaq's conduct was neither pervasive nor severe enough to plausibly constitute a hostile work environment. Whereas "repeated touching of intimate parts of an unconsenting employee's body is by its very nature severely intrusive," "[c]asual contact" such as "[a] hand on the shoulder, a brief hug, or a peck on the cheek" would not generally "create a hostile environment in the absence of aggravating circumstances such as continued contact after an objection." *Redd v. New York Div. of Parole*, 678 F.3d 166, 177, 179 (2d Cir. 2012) (emphasis and internal citation omitted). Further, "[f]or sexist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of sexual enmity." *Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 458 (S.D.N.Y. 2013), *aff'd sub nom. Dabney v. Bed Bath & Beyond*, 588 F. App'x 15 (2d Cir. 2014) (internal quotation marks and citations omitted). Separated in time by nine months, the two incidents described in plaintiff's complaint—sexual innuendo and being grabbed on the head and arm from behind—are quintessential "[i]solated acts," which generally do not "meet the threshold of severity or pervasiveness." *Alfano*, 294 F.3d at 374.

**\*7** The Second Circuit has found no hostile work environment to exist as a matter of law on facts similar to these. For example, in *Quinn v. Green Tree Credit Corp.*, the plaintiff alleged that her supervisor had told her that she "had been voted the 'sleekest ass' in the office" and that, "on another occasion, he 'deliberately touched [her] breasts with some papers that he was holding in his hand.' " 159 F.3d 759, 768 (2d Cir. 1998), *abrogated on other grounds by Morgan*, 536 U.S. 101. The Second Circuit concluded that these "obviously offensive and inappropriate" acts were "sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded [the plaintiff's] work environment" and that they were not "of sufficient severity to alter the conditions of [the plaintiff's] employment without regard to frequency or regularity." *Ibid.* Similarly, in *Mormol v. Costco Wholesale Corp.*, the plaintiff alleged that her supervisor had sexually propositioned her twice in the span of one month, and then, when she did not agree, retaliated against her by cutting her hours and issuing her a pretextual disciplinary writeup. 364 F.3d 54, 55–56 (2d Cir. 2004). The Second Circuit ruled that these events "were not sufficiently severe or pervasive to create a hostile work environment" and that the alleged harassment was "not sufficiently severe to overcome its lack of

pervasiveness." *Id.* at 58–59. Plaintiff's allegations are of a piece with *Quinn* and *Mormol* and therefore fail to state a claim for hostile work environment.

Plaintiff relies on *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597 (2d Cir. 2006), but *Schiano* involved more conduct, in terms of quantity, and more egregious conduct, in terms of severity, than alleged by plaintiff. There, the plaintiff's supervisor engaged in a sustained campaign of harassment over the course of five months. *See id.* at 600. He repeatedly sexually propositioned her; commented on plaintiff's looks and speculated about the type of underwear she wore with another coworker; pulled up her skirt at an office Christmas party in front of other coworkers, touched her on her upper thigh, and took a photo; and, at work, approached her from behind, placed his hands on her back and neck and leaned into her while she worked on "five or six" separate occasions. *Id.* at 601–02. This sustained campaign of harassment is not comparable to two isolated instances over the course of nine months. Due to the disparity in the quantity and severity of allegations in these cases, the fact that the Second Circuit found *Schiano*'s facts to survive summary judgment has little bearing on whether plaintiff has stated a claim here.

Because plaintiff has not stated a hostile-work-environment claim under Title VII, defendant's motion to dismiss this claim is granted.

### B. NYSHRL

Prior to 2019, hostile-work-environment claims under Title VII and the NYSHRL were governed by the same standard. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 123–24 (2d Cir. 2013). In June 2019, "[t]he New York State Legislature passed several amendments to the NYSHRL ..., the effect of which [was] to render the standard for claims closer to the [more lenient] standard under the NYCHRL." *Jemmott v. N.Y.C. Health & Hosps. Corp.*, No. 19-CV-989 (RPK) (ST), 2022 WL 4468129, at *11 n.3 (E.D.N.Y. Sept. 26, 2022) (citation omitted). One change was that the standards for hostile-work-environment claims under Title VII and the NYSHRL diverged, with the NYSHRL eschewing the "severe or pervasive" standard of liability. *See* N.Y. Exec. Law § 296(1)(h); *see, e.g.*, *Ferrando-Dehtiar v. Anesthesia Grp. of Albany, P.C.*, 727 F. Supp. 3d 165, 189 (N.D.N.Y. 2024); *Mitura v. Finco Servs., Inc.*, 712 F. Supp. 3d 442, 452–53, 452 n.4 (S.D.N.Y. 2024); *Mayorga v. Greenberg*, No. 22-CV-387 (AMD) (RML), 2023 WL 6307994, at *8 (E.D.N.Y. Sept. 28, 2023). "[T]he NYSHRL now requires a plaintiff to establish that she was subjected to inferior terms, conditions or privileges of employment because of the individual's membership in one or more protected categories." *Ferrando-Dehtiar*, 727 F. Supp. 3d at 189 (quotation marks, ellipsis, and citation omitted).

Defendant moves to dismiss plaintiff's NYSHRL hostile-work-environment claim, arguing that "[p]laintiff's non-time barred allegations are isolated events, occurring only on two occasions and nine months apart," and therefore "did not result in any alleged inferior condition of her employment." Def.'s Mot. 13–14. Plaintiff's opposition does not respond to defendant's arguments for dismissal of this claim. In fact, the only time plaintiff mentions the NYSHRL at all is to assert that "[c]laims for hostile work environment under Title VII and NYSHRL are analyzed using the same standard," Pl.'s Opp'n 9, which, as described above, is an incorrect statement of the law for claims like plaintiff's that accrued after the amendments to the NYSHRL in 2019. Because plaintiff has effectively "failed to oppose [dismissal of this claim] in her opposition to [defendant's] motion to dismiss," the Court dismisses this claim as abandoned. *Wilkov v. Ameriprise Fin. Servs., Inc.*, 753 F. App'x 44, 46 n.1 (2d Cir. 2018); *see, e.g.*, *Mirvis v. Quay*, No. 19-CV-2573 (LDH) (VMS), 2023 WL 5671935, at *10 (E.D.N.Y. Sept. 1, 2023) (deeming claim abandoned where plaintiff's opposition did "not substantively respond to Defendants' legal argument" in the motion to dismiss); *Felix v. City of New York*, 344 F. Supp. 3d 644, 654–55 (S.D.N.Y. 2018) (same).

### III. Plaintiff Has Not Plausibly Alleged a Constructive Discharge

**\*8** Defendant moves to dismiss plaintiff's constructive discharge claim. Though plaintiff's amended complaint does not specifically bring a claim for "constructive discharge," the complaint's allegation that plaintiff felt compelled to resign because "the relentless harassment and undue pressure exerted by Captain Inshiqaq became unbearable," Am. Compl. ¶ 50, fairly encompasses a theory of constructive discharge. *See Fitzgerald v. Henderson*, 251 F.3d 345, 367 (2d Cir. 2001) (holding that

a complaint's factual allegations sufficiently raised a theory of constructive discharge even though it did not use that specific phrase).

"[A]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Petrosino v. Bell Atl.*, 385 F.3d 210, 229 (2d Cir. 2004) (citation omitted). A constructive discharge claim requires proof of working conditions even more intolerable than those necessary to prove an "ordinary" hostile-work-environment claim. *See Penn. State Police v. Suders*, 542 U.S. 129, 146–47 (2004) (citation omitted). Accordingly, because plaintiff has not plausibly alleged a hostile work environment, *see supra* pages 10–16, she also has not alleged working conditions so intolerable as to have forced her to quit involuntarily. *See Chenette v. Kenneth Cole Prods., Inc.*, 345 F. App'x 615, 620 (2d Cir. 2009).

## CONCLUSION

For the foregoing reasons, defendant's partial motion to dismiss is granted. Plaintiff's claims are dismissed as time barred to the extent they rely on the conduct of Gary Sylvester. Plaintiff's claims for hostile work environment under Title VII and the NYSHRL, and for constructive discharge, are dismissed for failure to state a claim.

SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 754147

## Footnotes

1    Plaintiff attached the EEOC's right-to-sue letter, which does not include the date on which plaintiff filed her charge, to her Am. Compl. 15. Defendant attached to its motion to dismiss a transmittal form prepared by EEOC to the Department of Justice regarding plaintiff's right to sue letter, which indicates plaintiff's charge was filed with the EEOC on August 21, 2023. Decl. of Eric Arbizo, Ex. 1. Though submitted by the defendant, the Court may consider this document because it is "integral to plaintiff's discrimination claims." *Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 591 n.1 (E.D.N.Y. 2013) (brackets and citation omitted) (citing cases). Plaintiff does not object to the Court's consideration of the document. *See generally* Pl.'s Opp'n (Dkt. #19).

2    Some of Inshiqaq's actions contributing to the alleged hostile work environment likewise fall outside the 300-day period covered by plaintiff's EEOC charge, but defendant does not dispute that these actions are part of the same pattern of conduct as Inshiqaq's actions falling within the 300-day period. *See* Def.'s Mot. 8–9 (arguing only that "[p]laintiff's claims based on the alleged conduct of Sylvester are time barred").

Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP, Not Reported in Fed. Supp. (2022)

106 Empl. Prac. Dec. P 46,936

KeyCite Yellow Flag

Distinguished by  Dinkins v. Mayorkas,   S.D.N.Y.,  April 25, 2024

2022 WL 524551

United States District Court, S.D. New York.

Nicholas MONDELO, Plaintiff,

v.

QUINN, EMANUEL, URQUHART & SULLIVAN, LLP, Peter Calamari, and David Eskanos, Defendants.

No. 21 Civ 02512 (CM)
|
Signed 02/22/2022

**Attorneys and Law Firms**

Daniel Maimon Kirschenbaum, Lucas Colin Buzzard, Joseph, Herzfeld, Hester, & Kirschenbaum, New York, NY, for Plaintiff.

Mark W. Lerner, Joshua David Fulop, Kasowitz, Benson, Torres LLP, New York, NY, for Defendants.

### DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO STAY DISCOVERY

COLLEEN McMAHON, U.S.D.J.

 *1  Plaintiff Nicholas Mondelo sues his former employer, the law firm Quinn, Emanuel, Urquhart & Sullivan, LLP, and two of its partners, Peter Calamari, and David Eskanos (together, "Defendants"), for employment discrimination on the basis of Plaintiff's Spanish ethnicity/ancestry/national origin, in violation of 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law (the "NYSHRL"), and the New York City Human Rights Law (the "NYCHRL"). Plaintiff seeks a permanent injunction restraining Defendants from further violating the relevant employment discrimination laws and an award of compensatory damages, punitive damages, and attorney's fees.

Defendants move to dismiss Plaintiff's action for failure to state a claim and further moves to stay discovery pending a resolution of that motion.

Defendants' motion to dismiss the Amended Complaint is granted in part and denied in part. Defendants' motion for a stay of discovery is denied as moot.

### BACKGROUND

The gravamen of the Amended Complaint is that Defendant David Eskanos, Plaintiff's supervisor at Quinn Emanuel Urquhart & Sullivan, LLP, discriminated against Plaintiff because he is Hispanic and of Spanish ancestry and national origin. Plaintiff alleges that Eskanos subjected him to continuous harassment and abuse over a period of years and made it impossible for him to perform his duties as a Regional Director of Information Technology. Specifically, he pleads that Eskanos treated Plaintiff much worse than he did the firm's other IT directors, none of whom is Hispanic. Eskanos's conduct purportedly created a hostile work environment for Plaintiff in violation of federal, state, and city employment discrimination law.

Case 3:25-cv-01578-BKS-MJK    Document 4    Filed 12/02/25    Page 43 of 55
Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP, Not Reported in Fed. Supp. (2022)
106 Empl. Prac. Dec. P 46,936

Plaintiff also alleges that Defendant Quinn Emanuel Urquhart & Sullivan, LLP is also liable for Eskanos's unlawful, discriminatory conduct, as is Defendant Peter Calamari, the former managing partner of the New York office, who temporarily served as a "buffer" between Plaintiff and Mr. Eskanos.

Plaintiff initiated this action by filing a complaint on March 23, 2021. *See* Dkt. No. 1. Defendants moved to dismiss the original complaint on July 12, 2021. *See* Dkt. No. 14. Rather than respond to the motion, Plaintiff filed a superseding amended complaint on August 2, 2021. *See* Dkt. No. 20, (the "Amended Complaint"). On August 17, 2021, Defendants promptly moved to dismiss the Amended Complaint, and sought a stay of discovery pending the resolution of their motion to dismiss. *See* Dkt. No. 23.

### I. Parties

Plaintiff Nicholas Mondelo is a Hispanic-American individual of Spanish ancestry and national origin. Amended Complaint ("Am. Compl.") ¶ 8. Mr. Mondelo was employed by Defendant Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel" or the "Firm") as Regional Information Technology Director for U.S. East Coast and Midwest from approximately April 2015 to March 2018, at which time he was demoted to the position of New York Information Technology Manager. *Id.* Mr. Mondelo held the position of New York Information Technology Manager until he was fired in May 2019. *Id.* ¶ 9. Before he was hired by Quinn Emanuel, Mondelo "had a successful 25-year IT career working at large international law firms, including BakerHostetler, Gibbons, P.C., and Milbank LLP." *Id.* ¶ 10.

**\*2** Defendant Quinn Emanuel, a California limited liability partnership, is a large, business litigation-focused law firm. According to the Amended Complaint, Quinn Emanuel is the largest law firm in the United States that is devoted solely to business litigation. Am. Compl. ¶ 4.

Defendant Peter Calamari is a partner at Quinn Emanuel; he was the managing partner of Quinn Emanuel's New York office at all relevant times until approximately March 2018. Am. Compl. ¶ 6.

Defendant David Eskanos was Quinn Emanuel's Chief Information Officer ("CIO") for the duration of Mr. Mondelo's time at the Firm. Am. Compl. ¶ 7.

### II. Factual Background

Mr. Mondelo was hired by Defendant Quinn Emanuel in April 2015 to serve as the Firm's Regional Information Technology ("IT") Director for the U.S. East Coast and Midwest. Am. Compl. ¶ 11. Mondelo was based out of the Firm's New York office but oversaw the Firm's IT operations for the New York, Washington DC, and Chicago offices. *Id.* ¶ 11-12.

Mondelo alleges that he was the only member of the Firm's IT department of Spanish ancestry, one of the only Hispanics in the entire department, and the only Hispanic Regional IT Director. *Id.* ¶¶ 18, 34. During at least one of the several Skype interviews Mondelo had with Eskanos prior to being hired, Mondelo informed Eskanos of his future plans to travel to Spain to visit his family. *Id.* ¶ 13.

When Mr. Mondelo started working for the Firm in April 2015, he reported directly to Eskanos. Eskanos worked out of the Firm's Los Angeles headquarters (*Id.* ¶¶ 12-15) but he had complete authority over the Firm's entire IT Department and was responsible for hiring all of the Firm's IT personnel. *Id.* ¶ 16. Mondelo also reported to Robert Shutt, the IT Director of the entire Firm, who was also based out of the LA office. *Id.* ¶ 14.

Mondelo alleges that, starting the day he was hired in April 2015, he was subjected to a constant stream of harassment, ridicule, and abuse from his supervisor, Mr. Eskanos. Am. Compl. ¶¶ 18-21. From the start, Eskanos made a habit of mocking and threatening to fire Mondelo on telephone conferences with Mr. Mondelo's staff, and of insulting Mondelo by calling him "worthless" and "stupid." *Id.* ¶¶ 19-20.

Case 3:25-cv-01578-BKS-MJK    Document 4    Filed 12/02/25    Page 44 of 55

Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP, Not Reported in Fed. Supp. (2022)

106 Empl. Prac. Dec. P 46,936

A. *Mondelo complains to HR about Eskanos's conduct.*

In September 2015, Mondelo informed Eskanos that he would be travelling to Spain to visit his family soon. Eskanos responded by calling him a "spic." Am. Compl. ¶ 21. Mondelo immediately filed a formal complaint with the Firm's Human Resources ("HR") department. *Id.* ¶ 22. Plaintiff informed Quinn Emanuel's HR personnel that Eskanos called him a "spic," and that Eskanos had, on many occasions, degraded Mondelo and his Spanish culture. *Id.* According to Mondelo, he was not the first to complain about Eskanos. Rather, "numerous other complaints, both formal and informal, had been logged against Mr. Eskanos by other employees of Quinn Emanuel's IT Department alleging racist and sexist behavior by Mr. Eskanos." *Id.* ¶ 23.

Notwithstanding the numerous complaints purportedly lodged about Mr. Eskanos's treatment of his employees, the Firm refused to take any disciplinary action against him. After receiving Mondelo's complaint about Eskanos's "blatant racism and ethnic hostility, Quinn Emanuel continued not only to employ Mr. Eskanos in a position of authority, but also continued to require Plaintiff to work under him." *Id.* ¶ 25. Mondelo alleges that Eskanos, who had been with the Firm since its founding, had a reputation within Quinn Emanuel as being "untouchable." *Id.* ¶ 24.

**\*3** The only action taken by Quinn Emanuel in response to Mondelo's complaint was to inform Mr. Mondelo that Defendant Peter Calamari, then-managing partner of the New York office, and Richard Schirtzer, then-managing partner of the Los Angeles office, would act as "buffers" between Mondelo and Eskanos. Am. Compl. ¶ 27. To his dismay, Mr. Mondelo continued to receive instructions from Eskanos through IT personnel in Quinn's Los Angeles office, and he had no choice but to communicate directly with Eskanos via email to obtain Eskanos' approval for various projects. But at least the arrangement meant that Mondelo "no longer had any verbal communication with Mr. Eskanos and could request assistance from Mr. Calamari in Quinn Emanuel's New York office." *Id.* ¶ 28.

B. *Eskanos continues to antagonize Mondelo.*

While Eskanos was no longer able to harass verbally Mondelo under the buffer arrangement, Mondelo alleges that Eskanos found ways to continue singling him out. Generally, Eskanos continued to treat Mondelo less favorably than he did Mondelo's fellow IT Directors, none of whom was Hispanic or of Spanish ancestry and none of whom had filed an internal complaint against Eskanos. Am. Compl. ¶¶ 18, 34, Eskanos' purportedly differential treatment of Mondelo was unrelenting.

For example, Eskanos began excluding Mondelo from the weekly IT managers' meetings, which were held to discuss important IT issues and to develop firm-wide IT strategies. Am. Compl, ¶ 32. And, "from the Fall of 2015 through May 2019, Mr. Eskanos ensured that Plaintiff's IT department in New York remained understaffed." Am. Compl. ¶ 30. Two IT employees in the New York office quit in 2015. Mondelo "repeatedly and for years" asked Eskanos directly for permission to hire replacements. *Id.* Eskanos either informed Mondelo that there was no need to hire any more staff or directed Mondelo to send him (Eskanos) the resumes of possible replacements. *Id.* Eskanos never hired anyone to fill the two open IT positions in the New York office, and "the chronic understaffing of Quinn Emanuel's New York office meant that Plaintiff, the only salaried employee in the New York IT department, was required to work longer hours in order to ensure that the department's work was completed." Am. Compl. ¶ 31.

Eskanos also treated Mondelo differently than his Regional IT Director counterparts when it came to approving travel and travel expenses. *Id.* ¶ 33-34. Eskanos required Mondelo to submit quarterly requests justifying his need to travel to the other offices that fell under his jurisdiction, and then frequently denied those requests. *Id.* ¶ 33. By contrast, Eskanos did not require that the other (non-Hispanic) Regional IT Directors submit such requests; he simply approved their travel expense reports. *Id.* ¶ 34.

Eskanos imposed unrealistic deadlines and budgets on Mondelo's work projects and then refused to provide him with the resources necessary to complete those projects. Am. Compl. ¶ 31. For example, Eskanos gave Mondelo two weeks to replace all

Case 3:25-cv-01578-BKS-MJK    Document 4    Filed 12/02/25    Page 45 of 55
Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP, Not Reported in Fed. Supp. (2022)
106 Empl. Prac. Dec. P 46,936

of the old computers in the New York office (the Firm's largest office) with new computers. Eskanos never approved overtime for Mondelo and his staff to complete the job, even though he did approve overtime for Mondelo's counterparts elsewhere to complete the same project with their staff for their respective offices. *Id.* Another example occurred in early 2018, when the Firm's Washington D.C. office was moving from one building to another. Mondelo was responsible for the move. He created a draft budget proposal detailing the budget required to complete the move and presented it to Mr. Calamari. Calamari approved the budget and Mondelo forwarded it to Eskanos. Eskanos denied the budget request outright, stating it was "too much," and then stripped Mondelo of his responsibilities related to the D.C. office move. Am. Compl. ¶ 34.

**\*4**  Mondelo alleges that throughout the buffer arrangement period (September 2015 – March 2018), he informed Mr. Calamari on several occasions of Eskanos's persisting unequal treatment and harassment. Am. Compl. ¶ 45. On several occasions, Mondelo "specifically informed Mr. Calamari that he believed Mr. Eskanos was retaliating against him for complaining about discrimination." *Id.* As far as Mondelo is aware, neither the Firm nor Mr. Calamari took any disciplinary action against Eskanos in response to Plaintiff's complaints to Calamari. "Instead, Mr. Calamari simply advised Plaintiff to 'try to work it out' before bothering him with any issues." *Id.*

### C. *The buffer period ends and Eskanos demotes Mondelo.*

In March 2018, Calamari informed Plaintiff that he would no longer be managing partner of the New York office, so the buffer arrangement would end. Am. Compl. ¶ 46. No sooner had the buffer arrangement dissolved than Eskanos demoted Plaintiff to IT Director for just the New York office, stripping him of his responsibilities for the Washington D.C. and Chicago offices. *Id.* ¶¶ 47-49. Eskanos replaced Plaintiff with Kenneth Mitchell, who is not Hispanic, and directed Plaintiff to report to Mitchell. *Id.* ¶ 49.

Beginning in early 2019, Eskanos ensured that Plaintiff did not have the resources or the support necessary to successfully accomplish a major operating system upgrade from Windows 7 to Windows 10. *Id.* ¶¶ 54-79. At the time, the New York office was Quinn Emanuel's largest office in the world, with over 800 employees (attorneys and staff) whose computers had to be upgraded to the new system. *Id.* ¶ 57. Eskanos undercut Plaintiff's ability to successfully rollout the new system in a number of ways.

First, Eskanos refused to allow Mondelo to directly interface with crucial technical support personnel at Microsoft, although Mondelo's counterparts were permitted to do so. Am. Compl. ¶¶ 58-60. Second, Eskanos refused to authorize overtime for Plaintiff's IT staff or to offer additional support to attorneys with any issues arising out of the rollout. *Id.* ¶ 67. Mondelo first tested Windows 10 with a small group of partners and it was a disaster. At the same time, IT director of the London office Kurt Pfaender (who is not Hispanic) faced similar issues with the rollout in his "much smaller" London office, but Eskanos allowed him to put the London office rollout on hold. *Id.* ¶¶ 55-57. But when Mondelo sought to similarly pause the rollout in New York, so that he could perform additional preparatory work, Eskanos denied the request and pressured him to complete the rollout. *Id.* ¶¶ 64, 68. All the while, Eskanos refused to tell the New York attorneys that the rollout was being done at his direction, effectively ensuring that Mondelo would take the blame for a botched rollout. *Id.* ¶¶ 70-76. Mondelo again sought Calamari's assistance, but Calamari refused to help. *Id.* ¶ 69.

The Windows 10 rollout was the last straw for Mondelo, who "was already severely stressed by the discriminatory and retaliatory treatment he suffered over the years." *Id.* ¶ 79. On May 10, 2019, "as a result of the stress caused by the ongoing discrimination and retaliation by Mr. Eskanos," Mondelo suffered a breakdown and was involuntarily committed to a psychiatric ward for three days. *Id.* ¶ 80. Following his release, Mondelo admits that he "was in an extremely poor mental state," that he acted erratically, and that he could no longer perform his job duties. *Id.* ¶ 81. He was fired on May 19, 2019, on a conference call with several New York partners. Later that day, he was involuntarily committed again. *Id.* ¶¶ 83-84.

Mondelo asserts that he has not been able to secure employment since his termination from the Firm. *Id.* ¶¶ 86-87.

Case 3:25-cv-01578-BKS-MJK    Document 4    Filed 12/02/25    Page 46 of 55

Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP, Not Reported in Fed. Supp. (2022)

106 Empl. Prac. Dec. P 46,936

DISCUSSION

I. Standard of Review

**\*5**  To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A]ll reasonable inferences should be drawn in favor of the plaintiff," but the "complaint must contain sufficient allegations to nudge a claim 'across the line from conceivable to plausible.' " *Sphere Digital, LLC v. Armstrong*, No. 20-cv-4313 (CM), 2020 WL 6064156, at *4 (S.D.N.Y. Oct. 14, 2020) (quoting *Twombly*, 550 U.S. at 555). Where a plaintiff fails to "nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

Federal Rule 12(b)(6) "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the truth of the allegations. *Id.* at 545

II. The Hostile Work Environment Claims

Plaintiff alleges that Quinn Emanuel and David Eskanos subjected him to a discriminatory, hostile work environment in violation of the New York City Human Rights Law (NYCHRL), the New York State Human Rights Law (NYSHRL), and 42 U.C.S. § 1981. *See* Counts I, III, and V. Defendants argue that Plaintiff's hostile work environment claims under the NYSHRL and the NYCHRL fail because they are untimely, and the Plaintiff's claims under § 1981 and the NYSHRL fail because Plaintiff has not alleged a severe or pervasive hostile work environment.

A. *Plaintiff's hostile work environment claims are timely.*

Plaintiff's hostile work environment claims are not time barred.

The statute of limitations for any claim brought pursuant to the NYSHRL or the NYCHRL is three years. [1]  Defendants argue that Plaintiff's NYSHRL and NYCHRL hostile work environment claims are untimely because Plaintiff does not plead that any discriminatory conduct took place within the three-year limitations period. *See* Defendants' Memorandum of Law in support of their Motion to Dismiss the Amended Complaint ("Mem."), Dkt No. 24, at 8. Plaintiff initiated this action on March 23, 2021. So for his NYSHRL and NYCHRL claims to be timely, he must allege that at least *one* of the acts complained of that created or contributed to the alleged hostile work environment took place after March 23, 2018.

In *National Railroad Passenger Corp. v. Morgan*, the Supreme Court explained that "a hostile work environment claim ... will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." 536 U.S. 101, 122 (2002). As this court stated in *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 582 (S.D.N.Y. 2011), "the continuing-violation exception should be applied to hostile work environment claims because such claims challenge 'repeated conduct' that 'occurs over a series of days or perhaps years.' " *Id.* (quoting *Morgan*, 536 U.S. at 115). Thus, "so long as one act is within the limitations period, all of the acts can be relied on to show a hostile work environment." *Bermudez*, 783 F. Supp. 2d at 582; *see also Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009); *Washington v. County of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004).

**\*6**  Mondelo has alleged that at least one act which contributed to the hostile work environment occurred within the limitations period. For example, Plaintiff alleges that in the spring of 2019, Mr. Eskanos targeted Mr. Mondelo by forcing him to roll out a new Windows operating systems that Mr, Eskanos knew had serious issues and would cause major disruption in the New York office, while allowing the London IT Director, who is not Hispanic, to pause the London office rollout. Am. Compl ¶¶ 54-58.

Case 3:25-cv-01578-BKS-MJK    Document 4    Filed 12/02/25    Page 47 of 55
Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP, Not Reported in Fed. Supp. (2022)
106 Empl. Prac. Dec. P 46,936

So Plaintiff has pleaded a least one act that occurred within the limitations period. And "because the continuing-violation exception is applied in the same way whether the claim is under federal, state, or city law," all of Mondelo's hostile work environment claims are timely. *Bermudez*, 783 F. Supp. at 582 (applying the continuing violation exception to claims under § 1981, the NYSHRL, and the NYCHRL).

#### B. *Plaintiff's hostile work environment claims are adequately pleaded.*

Mondelo brings three separate hostile work environment claims: (1) Count I is a Section 1981 claim against Quinn Emanuel; (2) Count V is a NYSHRL claim against Quinn Emanuel and David Eskanos; and (3) Count III is a NYCHRL claim against Quinn Emanuel and David Eskanos.

As a threshold matter, the court notes that all of the challenged actions directed at Mondelo amounting to a hostile work environment were actions taken by Defendant Eskanos. Mondelo alleges that Quinn Emanuel knew about the on-going discrimination perpetrated by Eskanos and failed to adequately address or remedy the situation.

But Quinn Emanuel is named as a Defendant in all three of Mondelo's hostile work environment claims. So I must first determine whether Mondelo sufficiently pleaded a specific basis for imputing Eskanos's actionable conduct to their common employer, Quinn Emanuel. *Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995).

Whether the harassing conduct of a supervisor or coworker should be imputed to the employer is determined in accordance with common-law principles of agency. *Id.* Eskanos was Mondelo's supervisor, and when a supervisor wields the authority delegated to him by an employer to further the creation of a discriminatorily abusive work environment, the supervisor's conduct is deemed to be that of the employer and the employer's liability for that conduct is absolute. *Id.* (citing *Karibian v. Columbia University*, 14 F.3d 773, 779 (2d Cir.)).

Alternatively, liability attaches to an employer that has notice of an abusive environment but does nothing about it. *Id.*; *Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir. 1986). Eskanos allegedly used his position at the Firm – as Mondelo's supervisor – to interact with Mondelo in an abusive and discriminatory manner. And Mondelo alleges that Quinn Emanuel was made aware of the abusive environment created by Eskanos and did nothing about it. Thus, if I conclude that Mondelo has stated a hostile work environment claim against Eskanos, liability is imputed to Quinn Emanuel.

I address Mondelo's three hostile work environment claims in turn.

#### i. Count I: hostile work environment under Section 1981

Section 1981 provides that, "All persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens...." 42 U.S.C. § 1981(a). In practice, the statute "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004).

 **\*7**  I note that most federal employment discrimination claims are analyzed under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (the "*McDonnell Douglas* framework"), discussed more fulsomely below. *See infra*, section III.A. Federal hostile work environment claims, however, are not analyzed under the *McDonnel Douglas* framework. *Spence v. Bukofzer*, No. 15-CV-6167, 2017 WL 1194478, at *6 (S.D.N.Y. Mar. 30, 2017). Instead, federal hostile work environment claims are analyzed under the "severe or pervasive" standard, which requires that the alleged conduct "be severe or pervasive enough to create an objectively hostile or abusive work environment, and

106 Empl. Prac. Dec. P 46,936

the victim must also subjectively perceive that environment to be abusive." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014); *see also Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106–07 (2d Cir. 2011) (per curiam) (analyzing hostile work environment claim under the "severe or pervasive" standard and retaliation claim under *McDonnell Douglas*).

To state a § 1981 hostile work environment claim, a plaintiff must allege that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). Courts "must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) (quoting *Harris*, 510 U.S. at 23). And in this Circuit, Plaintiff "need not show that [his] hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered [his] working conditions." *Pucino v. Verizon Commc'n, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (emphases in original).

Mondelo alleges that "In violation of 42 U.S.C. § 1981, Quinn Emanuel intentionally discriminated against Plaintiff on the basis of his Hispanic race and/or his Spanish ancestry" by "subjecting Plaintiff to a hostile work environment." Am. Compl. ¶¶ 89-90 (Count 1).

Defendants argue that Plaintiff's § 1981 claim must be dismissed because the single derogatory comment ("spic") made by Eskanos is not severe or pervasive enough as to alter the conditions of Mr. Mondelo's employment and create an abusive working environment. Mem. 11.

While "even a single episode of harassment, if severe enough, can establish a hostile work environment," *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999), *abrogated on other grounds by Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), I might agree with Defendants if that were all that Plaintiff alleges. But it is not. Mondelo alleges that Eskanos exhibited a *pattern* of continuous harassment and disparate treatment extending over a period of years. He alleges that Eskanos made his job harder by setting unreasonable deadlines, denying overtime, and denying travel requests. And he contends, using examples, that Eskanos treated Mondelo's non-Hispanic counterparts differently (and better) than he treated Mondelo, and did not interfere with their ability to do their jobs in the same way he did with Mondelo. Mr. Mondelo alleges that he, the only Hispanic IT director, was the only director excluded from weekly department meetings. It does not matter that not all of the alleged conduct was *explicitly* discriminatory: Second Circuit "case law is clear that when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020).

 **\*8** Mondelo need only allege hostility pervasive enough that reasonable people would consider their working conditions to be altered as a result. And I conclude that reasonable people would consider their working conditions to be altered if Mondelo were able to prove what he alleges – which is that Eskanos made it difficult or impossible for Plaintiff to do his job effectively in a variety of ways. Other courts sitting in this Circuit have agreed. *See Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112, 115 (2d Cir. 2010) (hostile work environment found based on, *inter alia*, supervisor denied plaintiff tools which "made it difficult, if not impossible, for her to perform her work properly"); *Spence v. Bukofzer*, No. 15 CIV. 6167 (ER), 2017 WL 1194478, at *8 (S.D.N.Y. Mar. 30, 2017) (allegations that plaintiff was excluded from work meetings, received unfavorable assignments, was demoted, and complained internally about a racially hostile environment "plausibly describes an objectively hostile work environment that could have reasonably interfered with her ability to work").

Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP, Not Reported in Fed. Supp. (2022)

106 Empl. Prac. Dec. P 46,936

The cases cited by Defendants in support of dismissal are all distinguishable. Some of them did not arise on motions to dismiss, but were summary judgment motions, when the allegations of the complaint are no longer presumed true but must be supported by admissible evidence. *E.g., Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 119 (2d Cir. 2010) (summary judgment decision); *Demoret v. Zegarelli*, 451 F.3d 140, 150 (2d Cir. 2006) (summary judgment decision; no allegation of the use of a derogatory comment). Others did not involve the type of claims made in this case, or did not involve the use of a slur or derogatory comment directed at the plaintiff. *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) (no use of a racial slur alleged).

Next, Defendants argue that Plaintiff's Section 1981 claim fails because he does not allege that Eskanos's creation of a hostile work environment was motivated by animus towards Mondelo as a result of his membership in a protected class. Mem. 14. Defendants are correct that a hostile work environment plaintiff must allege that the severe or pervasive conduct at issue was, at least partially, motivated by a discriminatory intent. According to Defendants, "outside of the single untimely comment, there is no non-conclusory allegation that any of the subsequent conduct occurred because of Plaintiff's protected class," Mem. 14.

But Plaintiff "can raise an inference of a discriminatory motive in a number of ways, including by ... pleading specific facts suggesting that other, similarly situated employees outside of the plaintiff's protected class were treated better than the plaintiff" *Rothbein v. City of New York*, No. 18-CV-5106 (VEC), 2019 WL 977878, at *9 (S.D.N.Y. Feb. 28, 2019). And Plaintiff did precisely that. Specifically, he alleges that Eskanos exhibited animosity towards Plaintiff on the basis of his race and national origin by excluding him from meetings, refusing to approve his order requests, refusing overtime requests for Plaintiff's staff, and by requiring Plaintiff submit detailed justifications for travel only to (mostly) deny Plaintiff's travel requests. Am. Compl. ¶¶ 32-34 35-36, 38-40. And according to the allegations, Eskanos's conduct was not facially neutral because Eskanos did not treat Plaintiff's non-Hispanic counterparts the same way. He alleges that Eskanos demoted him from his job as a regional manager and stripped him of his regional responsibilities, and then replaced Plaintiff with a non-Hispanic person. *Id.* ¶¶ 46-50. Mondelo also alleges that Eskanos forced Plaintiff to prematurely roll out anew operating system and denied Plaintiff access to technical support, while, at the same time, Eskanos did not force Plaintiff's non-Hispanic counterparts in London to do the same. *Id.* ¶¶ 58-64. The facts as alleged raise an inference of discriminatory motive. *See Vaigasi v. Solow Mgmt. Corp.*, No. 11-CV-5088 (RMB) (HBP), 2014 WL 1259616, at *3, *11 (S.D.N.Y. Mar. 31, 2014) (denying a motion to dismiss a hostile work environment claim where the plaintiff alleged that he "was treated 'less well' than younger, less qualified employees" and provided specific examples, such as inequitable distribution of overtime opportunities and work assignments). Whether Mondelo can prove what he alleges is another matter altogether.

 **\*9**  Finally, I note that determining whether conduct is severe or pervasive enough to create a hostile work environment involves a question of fact and is generally inappropriate to determine at the pleadings stage of a litigation. *Patane v. Clark*, 508 F.3d 106, 114 (2d Cir. 2007) ("whether a particular work environment is objectively hostile is necessarily a fact-intensive inquiry"); *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999) (the existence a hostile work environment is a "mixed question of law and fact" because it involves "the application of a legal standard to a particular set of facts") (quoting *GAF Corp. v. Heyman*, 724 F.2d 727, 737 (2d Cir. 1983)). As my colleague Judge Failla observed, it is particularly difficult "for courts to perform the extraordinarily sensitive and comprehensive analysis necessary to assess a total set of workplace circumstances and determine whether a particular set of words and actions were enough to make that workplace a different, less tolerable environment for the victimized party." *Pryor*, 992 F. Supp. 2d at 259.

The Second Circuit has "repeatedly cautioned against setting the bar too high" on the standard for stating a hostile work environment claim. *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003). At this stage, Plaintiff's allegations – that he received disparate treatment and that Eskanos used an explicit, racial slur to describe him – are enough.

Accordingly, Defendants' motion to dismiss Count I is denied.

Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP, Not Reported in Fed. Supp. (2022)

106 Empl. Prac. Dec. P 46,936

ii. <u>Count V: hostile work environment under the NYSHRL</u>

Count II of the Amended Complaint is a NYSHRL hostile work environment claim against Defendants Quinn Emanuel and David Eskanos.

Until fairly recently, the standard applicable to hostile work environment claims brought pursuant to the NYSHRL mirrored the federal standard. But on October 11, 2019, amendments to the NYSHRL came into effect that eliminated the "severe and pervasive" standard. N.Y. Exec. Law § 300. The new standard requires a plaintiff allege that they were subjected to "inferior terms, conditions or privileges of employment because of the individual's membership in one or more ... protected categories." *Id.* This updated and more lenient standard is similar to the standard for stating a hostile work environment claim under the NYCHRL, discussed below. However, the amendment to the NYSHRL is not retroactive, meaning that the "severe and pervasive" standard applies to claims arising from conduct predating the effective date of the amendments. *McHenry v. Fox News Network, LLC*, 2020 WL 7480622, at *8 (S.D.N.Y. Dec. 18, 2020).

Because Plaintiff's claims are based on conduct that occurred prior to October 2019, the court applies the federal analog's "severe and pervasive standard" to Plaintiff's NYSHRL hostile work environment claim (Count V). *Bermudez v. City of New York*, 783 F.Supp.2d 560, 587 (S.D.N.Y. 2011).

For the reasons articulated above, Plaintiff has stated a hostile work environment claim under the NYSHRL against Eskanos. And because Eskanos is Quinn's agent as a matter of state law, his conduct can be imputed to Quinn Emanuel. Therefore, Count V survives as against both named Defendants: Quinn Emanuel and Eskanos.

Defendants' motion to dismiss Count V is denied.

iii. <u>Count III: hostile work environment under the NYCHRL</u>

Count III is a hostile work environment claim against Quinn Emanuel and Eskanos brought the NYCHRL. "The standard for maintaining a hostile work environment claim is lower under the NYCHRL." *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011). Indeed, "The New York City Human Rights Law was intended to be more protective than the state and federal counterpart." *Id.* (quoting *Farrugia v. N. Shore Univ. Hosp.*, 820 N.Y.S.2d 718, 724 (N.Y. Sup. Ct. 2006)). The NYCHRL imposes liability for hostile work conduct even where the conduct does not rise to the level of "severe or pervasive," as "questions of severity and pervasiveness are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability." *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 38 (2009).

 **\*10**  "Because Plaintiff has adequately pled a claim under the [old standard] NYSHRL, [he] has also done so under the NYCHRL." *Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 260 (S.D.N.Y. 2014); *see also Winston v. Verizon Servs. Corp.*, 633 F. Supp. 2d 42, 48 (S.D. N Y. 2009) ("if a plaintiff successfully states a claim under the NYSHRL, then '[a] fortiori' she has stated a claim under the NYCHRL") (alteration in original) (quoting *Brightman v. Prison Health Servs., Inc.*, 878 N.Y.S.2d 357, 358 (2009)).

Defendants' motion to dismiss Count III is denied.

III. The Retaliation Claims

Counts II, IV, and VI are retaliation claims. Mondelo alleges that, in violation of federal, state, and city law, Quinn Emanuel and Eskanos retaliated against him for complaining to HR and to Mr. Calamari about Eskanos's discriminatory conduct.

106 Empl. Prac. Dec. P 46,936

To prevail on his retaliation claims, Mr. Mondelo need not prove that his "underlying complaint of discrimination had any merit," only that his underlying complaint was motivated by a "good faith, reasonable belief" that the conduct complained of was unlawful. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012); *Reedy. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)).

I address the three retaliation claims in turn.

A. *The motion to dismiss Count II (Section 1981 against Quinn Emanuel) is denied.*

Mondelo alleges that, in violation of 42 U.S.C. 1981, Defendant Quinn Emanuel retaliated against him for reporting Eskanos's discriminatory conduct. The text of the statute does not prohibit (or even mention) retaliation, but the Supreme Court made clear, in *CBOCS W., Inc. v. Humphries*, 553 U.S. 442 (2008), that workplace retaliation is actionable under Section 1981. *CBOCS W.,* 553 U.S at 451 ("§ 1981 encompasses retaliation claims"). Section 1981 retaliation claims are governed by the same standards as retaliation claims brought under Title VII and are therefore analyzed using the *McDonnell Douglas* three-part burden-shifting framework. *Zann Kwan v. Andalex Grp.* LLC, 737 F.3d 834, 843 (2d Cir. 2013).

Under *McDonnel Douglas*, the burden initially falls on a plaintiff to plead a *prima facie* retaliation case. To state a *prima facie* case, Plaintiff must allege (1) that he participated in a protected activity, (2) that his participation was known to his employer, (3) that his employer thereafter subjected him to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). The plaintiff's burden of proof at the *prima facie* stage is *de minimis. Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). If and when the initial burden is met by the plaintiff, a "presumption of retaliation" arises, which the defendant may rebut by "articulating a legitimate, non-retaliatory reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). If the defendant provides such a reason, "the presumption of retaliation dissipates," and the burden shifts back to the plaintiff to prove "that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* (citation omitted).

 **\*11**  Mondelo alleges that "Quinn Emanuel intentionally retaliated and discriminated against Plaintiff for engaging in the protected activity of opposing and reporting incidents of discrimination based on his Hispanic race and/or Spanish ancestry" by "subjecting Plaintiff to a hostile work environment, increased scrutiny, and threats of termination," by "demoting him," and by "terminating Plaintiff's employment." Am. Compl. ¶ 18 (Count II).

Plaintiff points to multiple adverse employment actions; not just his demotion and firing, but also that he was subjected to Eskanos's persistent harassment and abuse because of his race. A cognizable "adverse employment action" is any conduct "that is harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Duplan v. City of New York*, 88 F.3d 612, 626-27 (2d Cir. 2018) (quotation marks omitted). In the retaliation context, an "adverse employment action" encompasses "a broader range of conduct than does the adverse-action standard for claims of discrimination" as it does not require that the "discriminatory actions ... affect the terms and conditions of employment." *Id.* at 90 (quotation omitted). To determine whether any of the alleged conduct amounts to an adverse employment action, the challenge actions must "be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quotation marks omitted).

Defendants primarily challenge causation; they argue that Plaintiff has not alleged a causal link between the alleged protected activity (reporting Eskanos's discriminatory conduct to HR and Calamari) and *any* of the alleged adverse employment actions. A causal link is alleged either by pleading facts to support the inference that the defendant was motivated by retaliatory animus, or by pleading a close temporal proximity between the protected activity and the retaliatory action. *Summer v. U.S. Postal Service*, 899 F.2d 203, 209 (2d Cir. 2009).

Case 3:25-cv-01578-BKS-MJK    Document 4    Filed 12/02/25    Page 52 of 55

Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP, Not Reported in Fed. Supp. (2022)

106 Empl. Prac. Dec. P 46,936

Specifically, Defendants assert that Plaintiff's demotion cannot be linked to his HR complaint because he was demoted two and a half years after he reported Eskanos to HR. And Plaintiff was terminated three and a half years after he complained to HR, So Plaintiff has not and cannot allege a close temporal proximity between his HR report and his demotion or subsequent termination. And Mondelo pleads no other facts suggesting that Quinn Emanuel's decision to demote or to fire Plaintiff was motivated by retaliatory animus.

I disagree.

Plaintiff alleges that after he complained to HR, "in continuation of his prior race/ancestry-based mistreatment of Plaintiff, and in clear retaliation of Plaintiff's hostile work environment complain, he continued singling Plaintiff out and *began* sabotaging Plaintiff's ability to succeed at the firm." Am. Compl. ¶ 29 (emphasis added). All of the alleged actions taken by Mr. Eskanos to sabotage Plaintiff's ability to succeed at his job were taken after Plaintiff complained to HR.

Plaintiff alleges a causal connection by a slim margin. But the allegations are enough for a claim of retaliation to survive a motion to dismiss for failure to state a claim. Defendants will have the opportunity to demonstrate that the adverse employment actions taken were motivated by legitimate, non-discriminatory reasons. But that is only appropriate for the court to take up at the summary judgment stage. We will revisit the issue at that stage in the litigation. But at this stage, the pleadings are sufficient.

**\*12**  Defendants' motion to dismiss Count II is denied.

### B. *The motion to dismiss Count VI (NYSHRL against Quinn Emanuel and Eskanos) is denied.*

Count II is a retaliation claim brought against Defendants Quinn Emanuel and David Eskanos for violations of the NYSHRL. Under the NYSHRL, it is unlawful to retaliate or discriminate against an employee because he "has opposed any practices forbidden under this article or because ... [he] has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(7).

Plaintiff's NYSHRL retaliation claim mirrors his Section 1981 retaliation claim: he alleges that "Quinn Emanuel and David Eskanos intentionally retaliated and discriminated against Plaintiff for engaging in the protected activity" by "subjecting Plaintiff to a hostile work environment, increased scrutiny, and threats of termination; stripping Plaintiff of his job duties and demoting him; and terminating Plaintiff's employment." Am. Compl. ¶¶ 125-6.

Retaliation claims brought under the NYSHRL are governed by the same standards as retaliation claims brought under Section 1981. *Zann Kwan,* 737 F.3d at 843. So Plaintiff's NYSHRL retaliation claim survives for the same reason his Section 1981 retaliation claim survives.

Defendants' motion to dismiss Count VI is denied.

### C. *The motion to dismiss Count IV (NYCHRL against Quinn Emanuel and Eskanos) is denied.*

The NYCHRL prohibits employers from "retaliat[ing] or discriminat[ing] in any manner against any person because such person has ... opposed any practice forbidden under this chapter." N.Y.C. Admin. Code § 8–107(7). The "adverse employment action" pleading standard is more lenient under the NYCHRL than under Section 1981 and the NYSHRL. [2]  To state a retaliation claim under the NYCHRL, a plaintiff "does not have to allege a materially adverse employment action," only a retaliatory act that is "likely to deter a person from engaging in the protected activity." *Bermudez,* 783 F. Supp. 2d at 588.

Case 3:25-cv-01578-BKS-MJK    Document 4    Filed 12/02/25    Page 53 of 55

Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP, Not Reported in Fed. Supp. (2022)

106 Empl. Prac. Dec. P 46,936

Because the Section 1981 and NYSHRL retaliation claims survive, so too does the NYCHRL retaliation claim, which is judged under a more lenient standard than its state and federal counterparts.

Defendants' motion to dismiss Count IV is denied.


  IV. The Aiding and Abetting Claims

Mondelo brings claims for aiding and abetting discriminatory conduct in violation of the NYCHRL and the NYSHRL against Defendant Peter Calamari. *See* Counts VII and VIII. The aiding and abetting claims hinge on Mr. Calamari's purported failure to take adequate remedial action in response to Plaintiff's complaints about Eskanos's discriminatory conduct. Am. Compl. ¶¶ 134, 138. From September 2015 (when Plaintiff first complained to HR about Eskanos) to March 2018, Mr. Calamari acted as a "buffer" between Plaintiff and Eskanos. *Id.* ¶ 27. Plaintiff alleges that during the "buffer period," he went to Calamari on numerous occasions about Eskanos's persisting unequal treatment and inference with Plaintiff's ability to do his job. According to Mondelo, Calamari took no action against Mr. Eskanos; instead, Calamari merely asked Plaintiff to "try to work it out." Am. Compl. ¶ 45.

 **\*13**  Under both the NYSHRL and the NYCHRL, "an individual employee may be held liable for aiding and abetting discriminatory conduct." *Krause v. Lancer & Loader Grp.*, 40 Misc.3d 385, 965 N.Y.S.2d 312, 323 (Sup. Ct., N.Y. Cty. 2013). The language of the NYSHRL and the NYCHRL is identical as to aiding and abetting liability; both provide that "it shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." N.Y. Exec. Law § 296(6); N.Y.C. Admin Code § 8-107(6); *see also Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) ("because the language of the two laws is virtually identical," the same standard governs aiding and abetting claims under the NYSHRL and NYCHRL).

To state an aiding and abetting claim, a plaintiff must plead that the alleged aider and abettor "actually participated" in the discriminatory conduct of the primary violator. *Farmer v. Shake Shack Enters.*, LLC, 473 F.Supp.3d 309, 337 (S.D.N.Y. 2020). Liability "must first be established as to the employer/principal before an individual may be considered an aider and abettor." *Davis-Bell v. Columbia University*, 851 F. Supp. 2d 650, 688 (S.D.N.Y. 2012).

So I must decide whether Plaintiff has adequately alleged that Mr. Calamari *participated* in Eskanos's discriminatory and retaliatory conduct (*e.g.* using a racial slur, excluding Mondelo from meetings, degrading him, denying him resources, and imposing deadlines that were impossible for Mondelo to meet).

Plaintiff does not allege that Mr. Calamari *directly* participated in Eskanos's misconduct. But Mr. Calamari can still be liable for aiding and abetting if he failed in a supervisory capacity to take appropriate remedial or investigative measures. And indeed, "A supervisor's failure to take adequate remedial measures in response to a complaint of discrimination can, *with proper factual allegations*, constitute actual participation. *Parra v. City of White Plains*, 48 F. Supp. 3d 542, 555 (S.D.N.Y. 2014)(Emphasis added).

Defendants argue also that the aiding and abetting claims against Calamari must be dismissed because "it is undisputed that Calamari had no supervisory role over Plaintiff." Mem. 22. At this preliminary stage, I cannot agree with this contention. The Amended Complaint states that, starting in October 2015, Mr. Calamari acted as a "buffer" between Mondelo and his supervisor, Eskanos. Am. Compl. ¶ 27. I can certainly infer that as a "buffer" between Plaintiff and Plaintiff's supervisor, Calamari acted as an intermediate supervisor to Plaintiff. And as then-managing partner of Quinn's New York office, the office at which Plaintiff was based, Calamari was senior in rank to Mondelo; even if he was not technically Mondelo's supervisor, he was in a position of authority and may well have had power over Mondelo's work activities. So it is hardly "undisputed" that Calamari had no supervisory role over Plaintiff. In fact, Mondelo specifically pleaded that in at least one instance he went to Calamari for supervisory assistance: in preparing a budget for the D.C. office move, Mondelo "first presented the draft budget to Mr. Calamari, who assisted him with crafting a letter to Mr. Eskanos explaining the reasons for the requested budget." Am. Compl. ¶ 42.

Case 3:25-cv-01578-BKS-MJK    Document 4    Filed 12/02/25    Page 54 of 55
Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP, Not Reported in Fed. Supp. (2022)
106 Empl. Prac. Dec. P 46,936

However, Defendants are correct when they urge that Plaintiff has failed to plead the "proper factual allegations" necessary to state a claim of supervisory liability under the State and City statutes.

Under both of these laws, aiding and abetting liability does not attach to a supervisor unless the facts alleged demonstrate that the aider and abettor shared the intent or purpose of the principal actor. "There can be no partnership in an act where there is no community of purpose." *Warren v. Ultimate Fitness Grp.*, LLC, No. 19-CV-10315 (KMK), 2021 WL 4239246, at *5 (S.D.N.Y. Sept. 17, 2021) (quoting *Fried v. LVI Servs., Inc.,* 2011 WL 2119748, at *8 (S.D.N.Y. May 23, 2011)).

 **\*14**  As Defendants correctly point out, Mondelo has not pleaded any facts from which a trier of fact could infer that Mr. Calamari failed to intervene because he too harbored an intent to discriminate against Mr. Mondelo because he was Hispanic. The court can infer Mr. Eskanos's discriminatory intent at the pleading stage because Plaintiff has pleaded facts tending to show, if believed, that Eskanos treated Plaintiff's non-Hispanic counterparts better than he treated Mr. Mondelo. But no facts are similarly pleaded that would allow a trier of fact to draw the same inference about the intentions of Mr. Calamari.

Plaintiff would have the court draw the inference that Mr. Calamari harbored an anti-Hispanic bias based on his purported failure to take appropriate remedial measures despite Mondelo's repeated complaints. But, "Failing to respond to others' violations of the NYSHRL [and the NYCHRL] does not, without more, support aiding and abetting liability." *Warren,* 2021 WL at *5-6. In *Warren,* Judge Karas in this District denied the plaintiff's motion to amend her complaint to add a claim of aiding and abetting under the NYSHRL against the third-party human resources company that her employer contracted with for failing to adequately address and remedy her complaints. Judge Karas denied the motion because new allegations that the HR company responsible for handling the plaintiff's complaints "should have done more" or should have "responded differently" to the complaints "does not amount to active participation in the [primary violator's] alleged harassment and discrimination." *Id.* at *6. The court held that, "Mere ineptitude and insensitivity in response to a complaint of harassment standing along is insufficient to support a finding of personal liability" necessary to state a claim for aiding and abetting. *Id.* (quoting *Beattie v. Farnsworth Middle Sch.,* 143 F. Supp. 2d 220, 230 (N.D.N.Y. 1998)). And, without more, aiding and abetting liability does not attach in this Circuit "for failing to adequately investigate a claim of discrimination." *Kalola v. Int'l Bus. Machines Corp.,* No. 13 CV 7339 (VB), 2015 WL 861718, at *11 (S.D.N.Y. Feb. 3, 2015); *see also Karibian v. Columbia Univ.*, 930 F. Supp. 134, 146 (S.D.N.Y. 1996) (the aiding and abetting laws do not contain language "expressly creating liability for failure to investigate and remedy a complaint of discrimination").

Because Mr. Calamari's failure to take remedial measures does not in and of itself establish aiding and abetting liability, the aiding and abetting claims against him fail.

Accordingly, Counts VII and VIII are dismissed. But I will dismiss them without prejudice, giving Plaintiff 21 days to file an amended complaint in which he pleads *facts* (not mere conclusions) tending to show that Mr. Calamari shared Mr. Eskanos's intent to discriminate. If he fails to do so, the dismissal of these counts without prejudice will be converted to dismissal with prejudice.

## CONCLUSION

For the reasons discussed above, the motion to dismiss Counts VII and VIII of the Amended Complaint is granted, without prejudice; the motion to dismiss is otherwise denied, as is Defendants' motion to stay discovery.

This constitutes the decision and order of the court. It is a written opinion.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 524551, 106 Empl. Prac. Dec. P 46,936

106 Empl. Prac. Dec. P 46,936

---

### Footnotes

1    N.Y. C.P.L.R. 214(2); N.Y.C. Admin. Code § 8-402; *see Bermudez v. City of New York,* 783 F. Supp. 2d 560, 573 (S.D.N.Y. 2011) (statute of limitations for claims under the NYSHRL and the NYCHRL is three years).

2    Under the NYCHRL, "The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment, housing or a public accommodation or in a materially adverse change in the terms and conditions of employment, housing, or a public accommodation, provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity." N.Y.C. Admin. Code § 8-107(7)

---

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.